Roger BOSHES et al., Plaintiffs,

v.

**GENERAL MOTORS CORPORATION,**
Defendant.

No. 68 C 1454.

United States District Court,
N. D. Illinois, E. D.

May 3, 1973.

A. Bradley Eben, Milton K. Joseph, Charles Liebman and Raymond I. Sue-koff, Chicago, Ill., for plaintiffs.

Hammond E. Chaffetz, Joseph Du-Coeur and Alan I. Becker, Kirkland & Ellis, Chicago, Ill., and Ross L. Malone and Robert A. Nitschke, General Motors Corp., Detroit, Mich., for defendant.

MEMORANDUM OPINION

DECKER, District Judge.

Plaintiffs, Roger Boshes, Esther K. Roerig, Curtis Collum, Frank Jackson and James Taylor, filed this private an-

titrust action on behalf of themselves and "all those similarly situated" against General Motors Corporation ("GM"), described in the complaint as the "colossus of the giant automobile industry", seeking treble damages for alleged violations of the federal antitrust laws, including combining and conspiring to monopolize and fix prices on the passenger automobile line of commerce in the United States market. See, 15 U.S.C. § 15. Plaintiffs allege that between the years 1965 and 1968 each purchased a new automobile manufactured by one of the manufacturing divisions of GM, specifically the Chevrolet and Buick Divisions. They claim that a portion of the price they paid was an illegal overcharge attributable to GM's alleged antitrust law violations.

The 22-page complaint, with approximately 40 pages of detailed exhibits attached,[1] sets forth the financial status of each of the leading automobile manufacturers in the United States and outlines the development of GM as a corporate entity from 1916 to the present. According to the complaint, during the period 1964–1967 GM had net sales in excess of 77 billion dollars and manufactured more than half of the passenger automobiles produced in the United States. Its customers number "in the millions", and plaintiffs claim that during the four years prior to the filing of the complaint more than 17 million GM automobiles were purchased. The complaint further states that the acquisition and operation of what are now the Buick, Cadillac, Chevrolet, Pontiac and Oldsmobile Divisions of GM resulted in a combination and conspiracy among the Divisions to set wholesale prices on all competing lines of GM and to formulate "prices, pricing policies and procedures for all the passenger automobiles manufactured and sold by the Divisions" as a matter of central management policy at GM. The damages sought should be measured, according to plaintiffs:

"25. The tortious setting of prices as aforesaid which has gone on continuously for many years prior to the four-year limitations period and which still goes on precludes, by the defendant, General Motors' own wrong, a precise ascertainment or computation of the amount of damages sustained by the plaintiffs and the class they undertake to and do represent, by the conduct of defendant, General Motors, forbidden in the anti-trust laws. The defendant, General Motors, has been unjustly enriched by its said conduct. It would be against public policy to permit the defendant, General Motors, to retain the fruits of its illegality. These fruits are the excess profits which it has collected and retained, and continues and will continue to collect and retain on account of its said illegal conduct. These excess profits should be measured in the alternative, (a) by the excess in percentage of profit on defendant, General Motors' sales over the average such profit on sales by manufacturing enterprises in the United States during the periods covered by this suit, as shown by the statistics of the United States Department of Commerce, or (b) the excess in such percentage of defendant General Motors' profits on sales, over the percentage of profit on sales earned by Ford Motor Co., the closest and most comparable competitor of the defendant General Motors in the passenger automobile market in the United States during said periods, or (c) such other measure of damages as may be appropriate.

"Under any of the alternatives (a), (b) or (c) the amount of excess profits, unjust enrichment and illegal gain

---

1. The exhibits are copies of statistical financial data extracted from two leading financial reporting services; Moody's and Standard & Poor's. The data covers all of the leading U. S. automobile manufacturers.

of the defendant General Motors exceeds one billion dollars for each of the four years preceding the filing of this complaint, and appears likely to continue in the same or a larger annual amount."

More than two years after the original complaint was filed, plaintiffs filed an extensive document with multiple exhibits entitled "Amendment No. 1 to Complaint". The amendment states that from 1929 to the present GM and certain "wholly owned and/or controlled subsidiary corporations" conspired and combined to fix retail prices and the terms of sale on GM automobiles as well as to monopolize and allocate the business of selling said automobiles under an arrangement known as the "Motors Holding Plan". The "Motors Holding Plan" is a means by which GM has organized and financed retail dealers over the years since 1929 in the United States. The amendment alleges that "[Of] the 12,500+ present General Motors retail dealers, approximately 1600 have acquired and paid for their dealerships under the Motors Holding Plan, and approximately 500 are now being financed under the Plan." There is no allegation as to whether or not any of the named plaintiffs purchased an automobile from any of the Holding Plan dealers. Essentially, the amendment to the complaint charges that by reason of the Motors Holding Plan and certain "Option", "Bonus", and "Dealer Selling" agreements, the GM financed dealers are "not free to reduce the prices at which the dealership sells its automobiles" because such dealers must make enough profit to retire their financing debt. It is further claimed that as a result of the financial pressure on GM financed dealers to keep their profits high, other GM dealers have maintained artificially high prices, especially since Holding Plan dealers must, at least under the selling agreement, remain in a certain location while the agreement is in force.[2] A conspiracy to fix prices between GM and the Holding Plan dealers, which are characterized as GM subsidiaries, is also alleged. All of the foregoing, in plaintiffs' view, is a *per se* violation of the antitrust laws.

This case was originally assigned to then Chief Judge William J. Campbell and was received from his calendar when Judge Campbell relinquished his cases after having assumed senior status. On December 11, 1970, Judge Campbell dismissed the complaint insofar as it alleged liability for intra-corporate conspiracy, but denied a motion to dismiss the amended complaint on July 8, 1971. Hence, the complaint, in its amended form and absent allegations of intracorporate conspiracy, still stands, although it is not exactly clear what that amounts to from the standpoint of legal sufficiency. Defendant has now moved that the complaint be dismissed on the ground that plaintiffs lack standing to sue.[3] Plaintiffs, in turn, have moved that this action be certified as a class action under Rule 23, Federal Rules of Civil Procedure. The motions will be treated separately herein.

Before considering the legal issues raised by the motions, a brief caveat is necessary. First, because defendant's motion to dismiss is based on the pleadings as they stand, the allegations of the complaint are assumed to be true. The

---

2. The alleged nature of the various agreements is fully set forth in the amendment to the complaint.

3. Plaintiffs' contention that defendant's motion is not in conformity with the rules of this court because it is a motion to dismiss for failure to state a claim "combined with" a motion for summary judgment "not supported by affidavit or other evidentiary material" is without merit. The issue of standing is properly before the court and should be considered before either party is required to proceed. Only the complaint and matters recognized by both parties as encompassed by judicial notice will be considered.

court intends, at least at this point, to adopt the previous rulings of Judge Campbell and assume that some viable, albeit amorphous, antitrust claims are stated in the complaint as it stands. Therefore, in spite of the somewhat confusing and dubious substantive posture of this lawsuit, consideration of the legal question of standing must proceed on the assumption that plaintiffs could prove some antitrust violation resulting in an overcharge to some person or legal entity.

I.

The legal issue raised by defendant's motion is, simply stated, whether consumers, who have not alleged any *direct* purchases from the defendant manufacturer, have standing to seek damages against the aforesaid manufacturer for alleged antitrust violations (monopolization and price fixing) resulting in "overcharges" for the manufacturer's product. Plaintiffs contend that they were damaged because the alleged overcharge was "passed-on" to them by GM retail dealers.[4] Defendant asserts that, as a matter of law, any overcharges were *not* passed-on to the consumer and, not having suffered any provable damages, plaintiffs lack standing to sue.

In support of its position, GM relies heavily on Hanover Shoe, Inc. v. United Shoe Machinery, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). In that case, the Supreme Court held, *inter alia,*

that the trial court's failure (and refusal) to consider evidence that plaintiff had "passed-on" to *its* customers the alleged illegal overcharges was not error.

"The Court of Appeals, like the District Court, rejected this assertion of the so-called 'passing-on' defense, and we affirm that judgment.

"Section 4 of the Clayton Act, 38 Stat. 731, 15 U.S.C. § 15, provides that any person 'who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . and shall recover threefold the damages by him sustained . . . .' We think it sound to hold that when a buyer shows that the price paid by him for materials purchased for use in his business is illegally high and also shows the amount of the overcharge, he has made out a prima facie case of injury and damage within the meaning of § 4.

" . . . We hold that the buyer is equally entitled to damages if he raises the price for his own product." 392 U.S. at 488–489, 88 S.Ct. at 2228, 2229.

Since the time the *Hanover Shoe* decision was announced, several courts have held that those who do not purchase *directly* from an alleged antitrust violator (whether they be consumers or not), except in certain limited circumstances, do not have standing to sue the alleged violator.[5] In establishing a direct pur-

4. See generally, Pollack, "Standing to Sue, Remoteness of Injury, and the Passing-On Doctrine", 32 A.B.A. Anti-Trust L.J. 5 (1966); Note, "Standing to Sue for Treble Damages Under Section 4 of the Clayton Act", 64 Col.L.Rev. 570 (1964).

5. *Donson Stores, Inc. v. American Bakeries Co.,* 58 F.R.D. 481 (S.D.N.Y.1973); Balmac, Inc. v. American Metal Products Corp., 1972 Trade Cas. ¶ 74,235 (N.D.Calif.1972); City of Akron v. Laub Baking Co., 1972 Trade Cas. ¶ 73,930 (N.D.Ohio 1972); In Re Western Liquid Asphalt Cases, 350 F.Supp. 1369 (N.D.

Calif.1972); Travis v. Fairmount Foods Co., Inc., 346 F.Supp. 679 (E.D.Pa. 1972); *Philadelphia Housing Authority* v. American Radiator and Standard Sanitary Corp., 50 F.R.D. 13 (E.D.Pa. 1970), aff'd sub nom. Mangano v. American Radiator and Standard Sanitary Corp., 438 F.2d 1187 (3d Cir. 1971); City and County of Denver v. American Oil Co., 53 F.R.D. 620 (D.Colo.1971); United Egg Producers v. Bauer International Corp., 312 F.Supp. 319 (S.D.N.Y. 1970). See also, Atlantic City Electric Co. v. General Electric Co., 226 F.Supp. 59, 71 (S.D.N.Y.), application denied,

chaser rule of standing, the cases have essentially relied on the Supreme Court's rejection of the "passing-on" in *Hanover Shoe* as a basis for cutting off the right of recovery at the initial purchaser level in the chain of distribution. In that light, the *Hanover Shoe* decision deserves further consideration here.

To elaborate, *Hanover Shoe* was an action by a shoe manufacturer against a shoe machinery manufacturer to recover damages for overcharges in connection with the leasing of the shoe machinery manufactured by defendant. United Shoe, the machinery manufacturer, had already been found guilty of monopolization, in a suit prosecuted by the United States Government, in its leasing practices to Hanover Shoe and other shoe manufacturers which leased its shoe machinery. See, United Shoe Machinery Corp. v. United States, 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954). As a defense, United Shoe argued that the alleged overcharges had been simply "passed-on" by Hanover Shoe to *its* customers, and that if there had been no overcharges, Hanover Shoe would have charged less. Hence, United Shoe asserted, Hanover Shoe was not injured and, therefore, could not recover damages. In rejecting the so-called "passing-on defense", Justice White, speaking for the Court, stated that:

> "We are not impressed with the argument that sound laws of economics require recognizing this defense. A wide range of factors influence a company's pricing policies. Normally the impact of a single change in the relevant conditions cannot be measured after the fact; indeed a businessman may be unable to state whether, had one fact been different (a single supply less expensive, general economic

conditions more buoyant, or the labor market tighter, for example), he would have chosen a different price. Equally difficult to determine, in the real economic world rather than an economist's hypothetical model, is what effect a change in a company's price will have on its total sales. Finally, costs per unit for a different volume of total sales are hard to estimate. Even if it could be shown that the buyer raised his price in response to, and in the amount of, the overcharge and that his margin of profit and total sales had not thereafter declined, there would remain the nearly insuperable difficulty of demonstrating that the particular plaintiff could not or would not have raised his prices absent the overcharge or maintained the higher price had the overcharge been discontinued. Since establishing the applicability of the passing-on defense would require a convincing showing of each of these virtually unascertainable figures, the task would normally prove insurmountable.[9] On

"[9]. The mere fact that a price rise followed an unlawful cost increase does not show that the sufferer of the cost increase was undamaged. His customers may have been ripe for his price rise earlier; if a cost rise is merely the occasion for a price increase a businessman could have imposed absent the rise in his costs, the fact that he was earlier not enjoying the benefits of the higher price should not permit the supplier who charges an unlawful price to take those benefits from him without being liable for damages. This statement merely recognizes the usual principle that the possessor of a right can recover for its unlawful deprivation whether or not he was previously exercising it."

the other hand, it is not unlikely that if the existence of the defense is gen-

337 F.2d 844 (2d Cir. 1964). *Cf.* State of West Virginia v. Chas. Pfizer & Co., 314 F.Supp. 710 (S.D.N.Y.) aff'd. 440 F.2d 1079 (2d Cir.) cert. denied, 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971); State of Minnesota v. United

States Steel Corp., 8 Cir., 299 F.Supp. 596, rev'd. 438 F.2d 1380 (8th Cir. 1971). See also, Cusick v. N. V. Nederlandsche Combinatie Voor Chem Ind., 317 F.Supp. 1022, 1024 (E.D.Pa.1970).

erally confirmed, antitrust defendants will frequently seek to establish its applicability. Treble-damage actions would often require additional long and complicated proceedings involving massive evidence and complicated theories." 392 U.S. at 492–493, 88 S. Ct. at 2231.

In addition to emphasizing the problems of proof attendant to recognizing the passing-on defense, which the Court sought to eliminate as a matter of policy by simply rejecting the defense, Justice White also noted that recognition of the passing-on defense in the case before the Court might significantly frustrate the purposes behind the private enforcement provisions of the statute. Finally, the opinion states that:

> "We recognize that there might be situations—*for instance,* when an overcharged buyer has a pre-existing 'cost-plus' contract, thus making it easy to prove that *he has not been damaged*—where the considerations requiring that the passing-on defense not be permitted in this case would not be present." 392 U.S. at 494, 88 S.Ct. at 2232. (Emphasis added.)

Defendant takes the position that the doctrine of the *Hanover Shoe* case applies to the circumstances of the present case so as to deny plaintiffs standing to sue because they are not direct or initial purchasers. Defendant argues that such a rule is required, in light of the *Hanover Shoe* decision, because the court should seek to avoid the possibility of double liability. Hence, the problem raised here is whether the "offensive" use of the passing-on concept should be recognized in spite of the fact that the Supreme Court has specifically rejected its "defensive" use in certain circumstances. In essence, defendant reads *Hanover Shoe* as establishing a general rule of "privity" for standing to sue in a private antitrust action. It is the opinion of this court that *Hanover Shoe* neither explicitly nor implicitly creates such a rule.

There are two clearly discernible policy statements made by Justice White in the *Hanover Shoe* opinion. The first is that under the circumstances of the case, the trial court was correct in refusing to consider evidence that, as a practical and economic matter, was purely subjective and speculative. It is important to recall that the facts of the *Hanover Shoe* case presented a particularly complicated problem with respect to the passing-on concept. In effect, United Shoe was asking the trial court to determine that overpayments on machine leases had been converted into price increases on shoes. In other words, the court would have had to speculate as to the effect of an illegally inflated portion of plaintiff's overhead costs on the price of plaintiff's own manufactured product, which is affected not only by overhead costs, but also by competition in separate wholesale and retail markets. Justice White understandably pointed out that "the task would normally prove insurmountable." 392 U.S. at 493, 88 S.Ct. at 2231.

The second policy statement offered in Justice White's opinion is that private enforcement of the antitrust laws should not be frustrated by permitting unduly complicated and speculative defenses when to do so might leave the burden of enforcement on those least likely to accept it. The conclusion is inescapable, in ruling as it did, that the Court believed it was fostering rather than limiting private antitrust enforcement. See, Philadelphia v. American Oil Co., 53 F. R.D. 45, 62 (D.N.J.1971).

Although the Court relied, to a certain extent, on Southern Pacific Co. v. Dar-

nell-Taenzer Lumber Co., 245 U.S. 531, 38 S.Ct. 186, 62 L.Ed. 451 (1918), an ICC case decided at a time when "privity" was a requirement of tort law,[6] the opinion nowhere specifically states that Hanover Shoe had standing *because* it was in "privity" with United Shoe or that privity is a requirement of standing in private antitrust cases. In fact, this court has searched in vain for any discussion of the question of standing in the *Hanover Shoe* opinion. If the Court there had intended to establish such a rule, it clearly would have said something about the recent and substantial body of authority which had reached a contrary conclusion and permitted suits under § 4 of the Clayton Act by those not in "privity" with the alleged antitrust violator. See, e. g., South Carolina Council of Milk Producers, Inc. v. Newton, 360 F.2d 414 (4th Cir.), cert. denied, 385 U.S. 934, 87 S.Ct. 295, 17 L. Ed.2d 215 (1966); Dailey v. Quality School Plan, Inc., 380 F.2d 484 (5th Cir. 1967); Clark Oil Co. v. Phillips Petroleum Co., 148 F.2d 580 (8th Cir. 1945); Vines v. General Outdoor Advertising Co., 171 F.2d 487 (2d Cir. 1948); Karseal Corp. v. Richfield Oil Corp., 221 F. 2d 358 (9th Cir. 1955); State of Washington v. General Electric Co., 246 F. Supp. 960 (W.D.Wash.1965). See also, Wilson v. Ringsby Truck Lines, Inc., 320 F.Supp. 699 (D.Colo.1970).[7] See generally, Note, "Standing to Sue for Treble Damages under Section 4 of the Clayton Act", 64 Col.L.Rev. 570 (1964). In State of Missouri v. Stupp Bros. Bridge & Iron Co., 248 F.Supp. 169, 174 (W.D. Mo.1965), Judge Oliver stated that:

> "We can not read into Section 4 of the Clayton Act a requirement of privity; nor do we believe that particular factual circumstances relating to whether or not illegal prices may or may not have been passed on is a relevant aid to be used in the construction and determination of the meaning of that statute. We speak, of course, only in regard to a plaintiff's right to sue; an entirely different question from the amount of damages a particular plaintiff may ultimately be entitled to recover."

Indeed, the language of the statute belies a general privity requirement. It simply reads: "*Any* person who shall be injured . . . " Admittedly, "any antitrust violation disrupts the competitive economy to some extent and creates entirely foreseeable ripples of injury". Billy Baxter, Inc. v. Coca-Cola Company, 431 F.2d 183 (2d Cir. 1970). Accordingly, in the interests of judicial economy and in order to avoid windfall recoveries and frivolous and multiplicitous lawsuits, courts have established some limitations, often labelled "standing", "remoteness", and/or "proximate cause" doctrines, on the rights of parties who are only incidentally injured to sue. See

6. See, Comment, "Mangano and Ultimate Consumer Standing: The Misuse of the Hanover Doctrine", 72 Col.L.Rev. 394, 410 n. 95.

7. The issues of standing and remoteness are virtually indistinguishable in the case law. In that regard, this court would certainly agree with the statement of Chief Judge Arraj in Wilson v. Ringsby Truck Lines, Inc., *supra,* at 701, that:

> "We must confess at the outset that we find antitrust standing cases more than a little confusing and certainly beyond our powers of reconciliation. The statutory provision about which there exists so much uncertainty itself seems straightforward:
> [Citing § 4 of the Clayton Act.]
> This language suggests that to bring a private action for violation of the antitrust laws a litigant need only allege that he has been injured, or is threatened with injury, by conduct which violates an antitrust law. However, because a treble damages award can be a severe penalty for a defendant and a 'windfall' for a plaintiff, numerous federal courts have developed rules designed to limit the classes of plaintiffs which can assert an antitrust violation."

*e. g.*, Billy Baxter, Inc. v. Coca-Cola Company, *supra*; Hawaii v. Standard Oil Co., 405 U.S. 251, 263, n. 14, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972), and cases cited therein. See generally, Comment, 72 Col.L.Rev., *supra*, at p. 398, n. 31. However, it would be stretching *Hanover Shoe* beyond all recognition to hold that its rejection of the passing-on defense somehow returns § 4 of the Clayton Act to the "days when 'privity' was king",[8] Billy Baxter, Inc. v. Coca-Cola Company *supra*, 431 F.2d at 190 (Waterman, J., dissenting). The line between those plaintiffs "too remote" or only "consequentially injured" and those whose injury is sufficiently "direct" may be difficult to draw in some cases. However, a simple rule of privity is inappropriate under the wording of the statute. As the Court stated in Radovich v. National Football League, 352 U. S. 445, 454, 77 S.Ct. 390, 395, 1 L.Ed.2d 456 (1957):

> " . . . this Court should not add requirements to burden the private litigant beyond what is specifically set forth by Congress in those [the antitrust] laws."

Or, expressed in another way:

> "The statute does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers. Nor does it immunize the outlawed acts because they are done by any of these. . . . . The Act is comprehensive in its terms and coverage, protecting all who are made vic-

tims of the forbidden practices by whomever they may be perpetrated." Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 334 U.S. 219, 236, 68 S.Ct. 996, 1006, 92 L.Ed. 1328 (1948).

Defendant argues that if *Hanover Shoe* does not preclude indirect purchasers from suing, then there would be a strong possibility of multiple liability. However, cutting off the rights of such a substantial number of potentially injured persons merely because such a "possibility" exists is far too drastic a measure to take. Moreover, not only does such an argument present a merely hypothetical objection, State of Washington v. American Pipe & Construction Co., 274 F.Supp. 961, 965 (W.D.Wash. 1967), but it is unlikely that such a result would ever obtain. First, the statute of limitations has already cut off the rights of the retail dealers from whom the plaintiffs presently before the court purchased their automobiles. Hence, the possibility of double liability is non-existent in the case of the named plaintiffs. As to other potential plaintiffs, if the statute of limitations does not obviate the possibilty of double liability, the doctrine of collateral estoppel probably would.[9] More importantly, the procedural resources available to both the court and the parties are sufficient to avoid such an inequitable result. See, Manual for Complex Litigation, 28 U.S. C. §§ 1404, 1407 (inter and intra-district

---

8. In this court's opinion, the consumers of shoes manufactured by Hanover Shoe would probably, under existing doctrine, have been held to have been "too remote" to recover damages against United Shoe under the facts of that case. However, that is so because the injury to consumers was consequential and difficult to measure in light of the fact that the overpayments were initially reflected in shoe machine leases. The fact that the consumers were not in "privity" with United Shoe is certainly irrelevant to any cause of action they might have under § 4 of the Clayton Act.

9. For example, a jury finding that an overcharge had been passed-on, particularly by a party in contractual privity with the alleged antitrust violator, would preclude relitigation of the same issue by the "passing-on" party (*e. g.* the initial purchaser) who is higher up in the distributive chain. See, Blonder-Tongue Laboratories, Inc. v. University of Illinois, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971).

transfer); 28 U.S.C. § 1335 (statutory interpleader).

■ After considering all of the defendant's arguments, it is the opinion of this court that plaintiffs in this case, as retail consumers of a product marketed in the same form that it was in when sold by the alleged antitrust violator, are not "too remote" to have standing to sue under § 4 of the Clayton Act. Cf. Commonwealth Edison v. Allis-Chalmers Mfg. Co., 315 F.2d 564 (7th Cir. 1963).[10] In this regard, it should be noted that this case is clearly distinguishable from the leading authority for the proposition that indirect purchasers do not have standing to sue under § 4. See, Philadelphia Housing Authority v. American Radiator and Standard Sanitary Corp., 50 F.R.D. 13 (E.D.Pa.1970), affirmed sub nom, Mangano v. American Radiator and Standard Sanitary Corp., 438 F.2d 1187 (3d Cir. 1971). Unlike the Mangano case, the fact-finder here would not be required to trace an overcharge from manufacturer to wholesaler to contractor to homebuilder to ultimate home purchaser (consumer). In this case, the product that leaves the manufacturer reaches the ultimate purchaser in the same form, and not merely as a small component or derivative of something else. Hence, many of the economic conversion factors eschewed in Hanover Shoe are absent here and will not, therefore, render proof of damages, at least in each individual case, an "insurmountable task". It can also be argued that facts such as those presented here were contemplated to fall within the so-called "cost-plus" exception, although in that event the exception may be broader than the rule. But cf. City and County of Denver v. American Oil Company, 53 F.R.D. 620 (D.Colo.1971). This court's disagreement with Mangano is not with the result reached but with the general rule stated in reaching the result.[11] It

---

10. Not only were the consumer plaintiffs (intervenors) in Allis-Chalmers remote from the standpoint of damages (i. e., overcharges on electrical equipment would have had to have been converted to higher electricity costs to the consumers), but jurisdiction over utility rate matters lies with the Illinois Commerce Commission, which is where plaintiffs probably should have gone. See, Cummings v. Commonwealth Edison Co., 64 Ill.App.2d 320, 213 N.E.2d 18 (1965).

11. It is interesting to note that Judge Miles W. Lord, sitting by designation in the broad spectrum antibiotics antitrust litigation, rejected the claim by purchasers of finished animal feed products containing the antibiotic drug that they had standing to sue the drug manufacturers. Although the Philadelphia Housing Authority case is cited approvingly, the factors considered by Judge Miles Lord speak more to the issue of remoteness rather than "privity". He noted that the affidavits filed by plaintiffs did not:

"... refute the fact that the plaintiffs asserting these claims did not purchase antibiotic drugs in the form sold by the defendants nor do they tend to establish that the manufacturers and distributors of medicated animal feed containing antibiotic drugs 'passed along' any illegal 'overcharge' in the cost of the terramycin by a pre-existing cost-plus contract or other analogous fixed mark-up arrangement. Instead, the facts suggest that the antibiotic product, once incorporated in the finished feed, passed through a second market composed of apparently competitive sellers, obscuring any effect the alleged antibiotic drug conspiracy might have had on the price of finished feed. The difficulty of plaintiff's case is greatly increased by the problems of competition, price determination, advertising and merchandising in the finished feed market, all of which enter into any determination of whether they felt the impact of the conspiracy.

"The court's conclusion concerning this aspect of the plaintiff's case is buttressed by the Second Circuit's recent discussion of Hanover Shoe v. United Shoe Machinery Corp., 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), in the course of its affirmance of the settlement reached before Judge Inzer B. Wyatt in many of the broad spectrum antibiotic actions. West Virginia v. Chas. Pfizer & Co., 440 F.2d 1079 (2d Cir. 1971), affirming 314 F.Supp. 710 (S.D.N.Y.1970)."

is this court's opinion that a general rule denying standing to indirect purchasers purely on the basis of "privity" would emasculate § 4 of the Clayton Act because those in privity with an alleged antitrust violator are often neither motivated nor in a financial or strategic position to maintain a private antitrust action. It is apparent from the language in Hawaii v. Standard Oil, *supra*, that the Supreme Court never intended to deprive private citizens of their "right" to sue for their own injuries from antitrust violations. As pointed out by Justice Marshall:

" . . . the conclusion is nearly inescapable that § 4 . . . . does not authorize recovery for economic injuries to the sovereign interests of a State.

"We note in passing the State's claim that the costs and other burdens of protracted litigation render private citizens impotent to bring treble-damage actions, and thus that denying

Hawaii the right to sue for injury to her quasi-sovereign interests will allow antitrust violations to go virtually unremedied. Private citizens are not as powerless, however, as the State suggests.

"Congress has given private citizens rights of action for injunctive relief and damages for antitrust violations without regard to the amount in controversy. 28 U.S.C. § 1337; 15 U.S.C. § 15. Rule 23 of the Federal Rules of Civil Procedure provides for class actions which may enhance the efficacy of private actions by permitting citizens to combine their limited resources to achieve a more powerful litigation posture. The District Court dismissed Hawaii's class action only because it was unwieldy; it did not hold that a State could never bring a class action on behalf of some or all of its consumer citizens." 405 U.S. at 265–266, 92 S.Ct. at 893.

In permitting the plaintiff-purchasers the necessary standing to bring this ac-

---

The settlement referred to by Judge Lord involved retail consumers of the antibiotic drugs and the drug companies. At both the trial court and the appellate court levels, various wholesalers and retailers objected to the allocation of or the participation in the settlement by consumers. Both courts rejected the notion that *Hanover Shoe* precluded consumers from recovery on the basis of lack of standing, although both courts intimated that even if the decision established such a rule, the situation was probably covered by the 'cost-plus' exception. See, State of West Virginia v. Chas. Pfizer & Co., *supra*, at 1088, where the court stated:

"In *Hanover Shoe* itself Justice White placed strong emphasis on the Court's desire to encourage private treble damage actions.

"These ultimate consumers, in today's case the buyers of single pairs of shoes, would have only a tiny stake in a lawsuit and little interest in attempting a class action. In consequence, those who violate the antitrust laws by price fixing or monopolizing would retain the fruits of their illegality because no one was available who would bring suit against them. Treble-damage actions, the im-

portance of which the Court has many times emphasized, would be substantially reduced in effectiveness [392 U.S. at 494, 88 S.Ct. at 2232].

"Keeping these comments in mind, there are then several obvious distinctions between the principles laid down in *Hanover Shoe* and the present case. First, the passing-on doctrine is not here being used as a defense to permit the defendants to escape liability, but rather as an attempt to award damages, insofar as is possible, to those who ultimately paid higher prices as a result of the collusive pricing, and to avoid giving a windfall gain to those who rather clearly were not injured. Secondly, to permit the use of the doctrine in the present circumstances will not act to limit or frustrate private treble-damage claims, but will, if anything, do the opposite."

The same argument was similarly rejected when raised in a motion for judgment n. o. v. following a finding of liability for antitrust violations by a jury. Leland Portland Cement Company et al. v. City of North Bay Village, No. Misc. 2364 (S.D.Fla.), interlocutory appeal denied (5th Cir., April 6, 1972).

tion to determine whether they have, in fact, suffered any injury as a result of any antitrust violation on the part of the defendant, this court's intent is to follow both the letter and the spirit of § 4 of the Clayton Act.

Accordingly, defendant's motion to dismiss for lack of standing is hereby denied.

The question remains whether this particular suit can be maintained as a class action.

## II.

Plaintiffs have moved for entry of an order that this action be certified as a class action under Rule 23 of the Federal Rules of Civil Procedure. The requirements of the rule are well known and have been stated innumerable times in contexts similar to the case at bar. It can be said at the outset that the allegations of the complaint are sufficient to satisfy the requirements of Rule 23(a). There is no significant dispute that the size of the alleged class, the general allegations of antitrust violations, and the claims of individual plaintiffs satisfy the general requirements of Rule 23(a). However, the requirements of subsection (b) of Rule 23 must also be satisfied if a class action is to be maintained. The parties are in sharp disagreement as to whether the alleged class is maintainable under Rule 23(b).

First, this court does not agree with plaintiffs' assertion that *all* of the subsections of Rule 23(b) are applicable in this case. It does not deserve extended discussion to state that in an action for damages, such as the present lawsuit, subsections (1) and (2) are not applicable. Eisen v. Carlisle & Jacquelin, 391 F.2d 555, 564 (2d Cir. 1968); Research Corp. v. Pfister Associated Growers, Inc., 301 F.Supp. 497 (N.D.Ill.1969).

The substantial question raised by plaintiffs' motion concerns subsection (b)(3). Of course, in deciding whether common issues of fact and law predomi-

nate over individual issues, there is no longer much doubt that questions of liability can be separated from individual questions of damages. State of Illinois v. Harper & Row Publishers, 301 F. Supp. 484 (N.D.Ill.1969); City of Philadelphia v. American Oil Company, 53 F. R.D. 45, 67 (D.N.J.1971). However, the inquiry does not end there. In fact, in cases such as the present one, it only begins at that point because even if common questions predominate, a class action may not be a superior or, to be more exact, a feasible method of adjudication because the "class" is simply unmanageable. It is the opinion of this court that the proposed class falls into the latter category.

Although size, in and of itself, will not generally be enough to make a class unmanageable, this court is unaware of any case that certified a class of the potential size proposed in this case. The figures are nothing less than staggering. The complaint alleges that for the years 1965–1968 alone, the purchasers of more than 17 million automobiles became members of the proposed class by reason of their purchase of a GM automobile. Furthermore, the complaint alleges continuing violations, and the class would presumably cover all purchasers of GM automobiles from 1965 until at least the date of certification of the class. A conservative estimate would put the number of class members somewhere between 30 and 40 million, although the exact number is difficult to calculate because many customers are repeat purchasers. These purchasers would be located in every state of the United States and, unless limited, in a number of foreign countries.

It would place an impossible burden upon any court to provide adequate notice to a proposed class of this size and thereafter to attempt to assemble and classify the transactional material required to identify the particular interest of millions of purchasers over this span of years. The mere prospect of these

clerical and administrative problems would be enough to justify a determination of unmanageability. Philadelphia Electric Co. v. Anaconda American Brass Co., 43 F.R.D. 452, 461–462 (E.D. Pa.1968); Reinisch v. New York Stock Exchange, 52 F.R.D. 561 (S.D.N.Y. 1971).

However, there are further reasons for denying the class action. Although plaintiffs might prove monopolization and price-fixing, they must also prove that they suffered damages and, with some reasonable degree of certainty, the extent of the damages. Gottesman v. General Motors, 436 F.2d 1205 (2d Cir. 1971); Blaski v. Inland Steel Co., 271 F.2d 853 (7th Cir. 1959). As Judge Angelli stated in City of Philadelphia v. American Oil Company, *supra*, 53 F.R. D., at 72, wherein a consumer class of gasoline purchasers in a two-state area was denied:

> "It is readily apparent that no matter how easy it is to establish damages on a class level, if it is extremely difficult or almost impossible to distribute these sums to their rightful recipients, the class is unmanageable."

Apart from the difficulties of notice and individual proof inherent to a class of the size proposed, the complexities of individual proof of damages in this case are overwhelming.

While this court disagreed with defendant that proof of damage on an individual basis was *not* sufficient to defeat plaintiffs' *standing* to sue, that determination should not be confused with the question of whether individual questions of damage are so numerous and complex *among* class members that the *class* is unmanageable. This case graphically illustrates that distinction. Although, for reasons noted above, any individual is not too remote to have standing before this court to plead and prove his damages, similarly, defendant is entitled to an adequate opportunity to raise defenses.

As defendant pointed out in its motion to dismiss, and in its response to plaintiffs' class action motion, several important factors might either mitigate or eliminate a damage claim of any individual plaintiff. For example, even if monopolization and price-fixing resulting in "excess profits" for GM were proven plaintiffs would still have to prove that retail dealers passed on the "overcharge" to them. Although on an individual basis the foregoing would not be impossible, it would be an endless task on a class-wide basis. Both parties admit that the retail automobile business is notorious for its haggling, and buyers "shop around" to get the best price. Competition among dealers in the same brand of automobile, in the same "price-range" or "class" of automobile manufactured by other companies, and within the overall automobile market varies considerably from one locale to another. Furthermore, each brand of GM automobile offers a number of models, each available with a wide range of optional equipment. Prices vary even among identical automobiles sold by different dealers. Prices vary considerably among the various makes, for example, Chevrolet and Cadillac. Hence, there does not appear to be any way to rationally and fairly distribute any damage "fund", assuming a violation by GM could be proved.

No workable formula has been suggested. See, Eisen v. Carlisle & Jacquelin, *supra*, 391 F.2d at 567; *cf*. State of Illinois v. Harper & Row Publishers, *supra*, which involved "net prices". Amendment No. 1 complicates matters further because proof of liability, i. e., that the GM financed dealers would have charged less but for the repayment obligation, would involve questions relating to the competitive market position of 500 different dealers.[12]

12. Presumably all of the GM financed dealers would be involved because at least *some* members of the class would have purchased from them.

It may be that denial of the class may effectively foreclose the opportunity of GM purchasers to come into court and prove any damages they have sustained. However,

"Rule 23 does not require or contemplate that courts will hear causes of action as class actions merely because they will not get to hear the case any other way." Eisen v. Carlisle & Jacquelin, *supra,* 391 F.2d at 572. (Lumbard, Chief J., dissenting.)

Again, as Judge Angelli explained:

"The argument that defendants should not be permitted to profit by the enormity as well as the magnitude of their conspiracy has been carefully considered. Assuming that there was a price-fixing conspiracy which affected all ultimate users of gasoline, this Court is well aware of the consequences of not certifying as a class the motorists who purchased from retail stations. These particular individuals purchased more gasoline than all other ultimate users put together. Not being able to sue as a class, their interests in maintaining an antitrust action are so minimal that no action will probably ever be commenced. Hence, the bulk of the ill-gotten gains reaped by defendants through their assumed conspiracy will remain untouched within their corporate coffers. Although this Court recognizes the importance of private antitrust actions to help enforce the antitrust laws, Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), it is not believed that Rule 23 was intended to permit a redress for all wrongs committed under the antitrust laws. This Court is cognizant of the complexities involved in suing on behalf of such large groups of people and entities as well as the laudable purpose sought to be achieved by class representation. However, the basic requirements of Rule 23 must be established before there can be class certification. It is unfortunate that many potential recipients of treble damage awards may not be able to recover because the Court has found their purported class to be unmanageable.

" . . . . Despite the commendable ends sought to be achieved by these and other cases to reach millions of ultimate consumers of a variety of products by the technique of class representation, this Court believes that the line must be drawn somewhere in those cases involving untold numbers of members of the general public. The manageability requirement of Rule 23 is a significant factor that must be given due weight in reaching a determination on the propriety of class representation in any given case. . . . This is not to say that guilty conspirators should not be compelled to disgorge their ill-gotten gains. The solution of the problem, however, lies not in imposing an increased burden on the federal courts over and above that which may or should normally be expected of judges in the discharge of their judicial duties, but rather in having the antitrust laws or rules amended to alleviate the problem of manageability inherent in class actions wherein millions of members of the consuming public are involved." 53 F.R.D. at 73, 74.

In this court's view, at least until some action is taken to permit a *parens patriae* type of suit to be maintained for the benefit of a broad class of consumers, the public must continue to rely on the Government to vindicate the purposes of the antitrust laws and protect the interests of the consumers in the position of these plaintiffs.[12]

12. After this opinion was released, the Second Circuit Court of Appeals released its third opinion in Eisen v. Carlisle & Jacquelin, 479 F.2d 1005 (2nd Cir. 1973). *Eisen III* strongly buttresses the conclusions previously reached here. In re-

■ Having reached the conclusion that a class action in this case would be unwieldy and unmanageable, there is no need to consider the further question whether these five individuals could properly represent the class in a suit of this magnitude.

Accordingly, plaintiffs' motion that this case be maintained as a class action is hereby denied.

jecting the class action which the plaintiff Eisen sought to maintain in behalf of some 6,000,000 odd lot investors, Judge Medina made this general observation which is particularly appropriate here:

" 'And yet, even if amended Rule 23 furnishes no satisfactory solution in situations where immense numbers of consumers have been mulcted in various ways by illegal charges, it would seem that some means should be provided by law for the redress of these wrongs to the community and to society as a whole. The numerous decisions by courts in these class action cases have at least exposed the lack of adequate remedy under existing laws. From our extensive study of the whole situation in working on this *Eisen* case it would seem that amended Rule 23 provides an excellent and workable procedure in cases where the number of members of the class is not too large. It seems doubtful that further amendments to Rule 23 can be expected to be effective where there are millions of members of the class, without some infringement of constitutional requirements. The problem is really one for solution by the Congress. Numerous administrative agencies protect consumers in various ways. It should, we think, be possible for the Congress to create some public body to do justice in the matter of consumers' claims in such fashion as to afford compensation to the injured consumer. If penalties are to be imposed upon wrongdoers, at least let the Congress decide how the money is to be spent.' "