**STATE OF ILLINOIS et al.,**
**Plaintiffs,**

v.

**AMPRESS BRICK CO., INC., et al.,**
**Defendants.**

**No. 73 C 2427.**

United States District Court,
N. D. Illinois, E. D.
April 29, 1975.

Lee A. Freeman, Freeman, Freeman & Salzman, Chadwell, Kayser, Ruggles, McGee & Hastings, Chicago, Ill., for plaintiffs.

Samuel J. Betar, Schippers, Betar, Lamendella & O'Brien, John E. Burke, Ross, Hardies, O'Keefe, Babcock & Parsons, Thomas F. Carey, Carey, Filter & White, Chicago, Ill., Robert A. Chapski, Elgin, Ill., George B. Collins, Collins & Amos, Chicago, Ill., Tinkham, Beckham, Kelly & Singleton, Hammond, Ind., John E. Sarbaugh, Thomas S. Howard, Richard J. Braun, Dept of Justice, Michael J. Guinan, Griffin, Guinan & Griffin, Edward F. Hatton, Jenner & Block, James P. Morgan, Richard L. Reinish, Price, Cushman, Keck, Mahin & Cate, Gary Senner, Sonnenschein, Carlin, Nath & Rosenthal, Chicago, Ill., Graham, Meyer, Young, Welsch & Maton, Danville, Ill., Roy B. Schneider, Jr., Morton Grove, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

KIRKLAND, District Judge.

This cause comes before the Court on defendants' motion for partial summary judgment against all plaintiffs who have purchased concrete block indirectly through contractors on competitive bid contracts, or have made direct purchases from non-defendants.

This case is a civil antitrust suit by the State of Illinois on its own behalf and on behalf of various governmental entities in the Greater Chicago area. All defendants, except American Brick Company, manufacture concrete block. The State brings this action under Section 4 of the Clayton Act, 15 U.S.C., § 15, alleging that defendants violated Section 1 of the Sherman Act, 15 U.S.C. § 1, by conspiring to fix the price of concrete block in the Greater Chicago area.

Approximately one-third of the more than seven hundred plaintiffs represented by the State have responded to interrogatories propounded by defendants. The responses reveal that only four of the plaintiffs purchased concrete block directly from a defendant. One plaintiff disclosed it had made direct purchases from a non-defendant. The remaining responding plaintiffs did not purchase concrete block directly from any defendant, nor did they purchase concrete block indirectly pursuant to a cost-plus contract. What these plaintiffs purchased were buildings: a package of goods and services of which concrete block was one component part.

All but nine of the responding plaintiffs awarded their building contracts pursuant to competitive bidding. The concrete block produced by defendants is sold primarily to masonry contractors who submit bids to general contractors for the masonry portions of projects. The general contractors in turn bid on an entire building project.

Defendants contend that only direct purchasers of concrete block have standing to sue the manufacturers for alleged violations of anti-trust laws.

Plaintiffs argue that the ultimate consumer of a price-fixed product should have standing to sue because the ultimate consumer bears the burden of the anti-trust violation.

The issue is whether parties more remote than the direct purchaser from an alleged anti-trust violator have standing to sue under Section 4 of the Clayton Act, 15 U.S.C. § 15.

Defendants argue that Hanover Shoe, Inc. v. United Shoe Machinery, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968) stands for the proposition that only direct purchasers from an anti-trust violator have standing to sue the alleged violator, except in certain limited circumstances. That case held that the trial court's refusal to hear evidence that the direct purchaser plaintiff had "passed-on" alleged illegal overcharges to its customers was not error, and that a direct purchaser's showing of payment of an illegally high price, along with the amount of overcharge, constitutes a prima facie case.

Some subsequent decisions have interpreted *Hanover* as limiting recovery to the initial or first purchaser in the chain of distribution.[1] Another line of authority is emerging to the contrary.[2]

In *Hanover*, a manufacturer of shoes brought suit against a shoe machinery manufacturer alleging that the machinery manufacturer's policy of leasing rather than selling shoe-making machinery led to monopolization of the industry by defendant. Defendant machinery manufacturer argued that plaintiff shoe manufacturer had passed the overcharge on to its own customers, thereby sustaining no loss. The Supreme Court rejected the "passing-on" defense, noting two grounds for its decision: (1) recognition of the defense would reduce the deterrent effect of private antitrust enforcement since the individual buyers of shoes could not effectively assert their claims; and (2) the consequent inquiry into profit and loss computations would unduly burden plaintiff and complicate the litigation.

The rationale behind the first reason was the need to preserve the effectiveness of antitrust laws. If the passing-on defense was permitted to stand, enforcement of antitrust violations would fall upon the ultimate consumer, the party least likely to bring suit:

These ultimate consumers, in today's case the buyers of simple pairs of shoes, would have only a tiny stake in a lawsuit and little interest in attempting a class action. In consequence, those who violate the antitrust laws by price fixing or monopolizing would retain the fruits of their illegality because no one was available who would bring suit against them. Treble-damage actions, the importance of which the Court has many times emphasized, would be substantially reduced in effectiveness. 392 U.S. at 494, 88 S.Ct. at 2232.

1. Donson Stores, Inc. v. American Bakeries Co., 58 F.R.D. 481 (S.D.N.Y.1973); Balmac, Inc. v. American Metal Products Corp., 1972 Trade Cas. ¶ 74,235 (N.D.Calif.1972); City of Akron v. Laub Baking Co., 1972 Trade Cas. ¶ 73,930 (N.D.Ohio 1972); Travis v. Fairmount Foods Co., Inc., 346 F.Supp. 679 (E.D.Pa.1972); Philadelphia Housing Authority v. American Radiator and Standard Sanitary Corp., 50 F.R.D. 13 (E.D.Pa.1970), aff'd sub nom. Mangano v. American Radiator and Standard Sanitary Corp., 438 F.2d 1187 (3d Cir. 1971); City and County of Denver v. American Oil Co., 53 F.R.D. 620 (D.Colo.1971); United Egg Producers v. Bauer International Corp., 312 F.Supp. 319 (S.D.N.Y.1970). See also, Atlantic City Electric Co. v. General Electric Co., 226 F. Supp. 59, 71 (S.D.N.Y.), application denied, 337 F.2d 844 (2d Cir. 1964). Cf. State of West Virginia v. Chas. Pfizer & Co., 314 F. Supp. 710 (S.D.N.Y.), aff'd 440 F.2d 1079 (2d Cir.) cert. denied, 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971); State of Minnesota v. United States Steel Corp., 8 Cir., 299 F.Supp. 596, rev'd 438 F.2d 1380 (8th Cir. 1971). See also, Cusick v. N. V. Nederlandsche Combinatie Voor Chem Ind., 317 F. Supp. 1022, 1024 (E.D.Pa.1970).

2. In Re Western Liquid Asphalt Cases, 487 F.2d 191 (9th Cir. 1973), cert. denied, 415 U.S. 919, 94 S.Ct. 1419, 41 L.Ed.2d 474 (1974); Boshes v. General Motors Corp., 59 F.R.D. 589 (N.D.Ill.1973); In Re Master Key Litigation, 1973 Trade Cases ¶ 74,680 (D.Conn. 1973).

The Supreme Court's second reason for rejecting the pass-on defense was the Court's conclusion that normally the pass-on issue would present "insurmountable" problems of proof.

A wide range of factors influence a company's pricing policies. Normally the impact of a single change in the relevant conditions cannot be measured after the fact; indeed, a businessman may be unable to state whether, had one fact been different . . ., he would have chosen a different price. . . . Even if it could be shown that the buyer raised his price in response to, and in the amount of, the overcharge and that his margin of profit and total sales had not thereafter declined, there would remain the nearly insuperable difficulty of demonstrating that the particular plaintiff could not or would not have raised his prices absent the overcharge or maintained the higher price had the overcharge been discontinued. Since establishing the applicability of the passing-on defense would require a convincing showing of each of these virtually unascertainable figures, the task would normally prove insurmountable. 392 U.S. at 492, 88 S.Ct. at 2231.

■ The Supreme Court rejected availability of the pass-on defense to an anti-trust violator as against his direct customer. The Court's concern was that attempts to establish the defense would bog down litigation and undermine the effectiveness of the private enforcement mechanism. The Court was determined to see that the anti-trust violator not slip away on some technical ground.

Defendants here attempt to use the Supreme Court's rejection of the pass-on defense to deny standing to sue to any plaintiff not a direct purchaser from the anti-trust violator.

Stressing the distinction between "offensive" and "defensive" use of the passing-on doctrine, Judge Decker in this district recently held that *"Hanover Shoe* neither explicitly nor implicitly" creates "a general rule of 'privity' for standing to sue in a private antitrust action." *Boshes* v. *General Motors Corp.,* 59 F.R.D. 589 (N.D.Ill.1973). Judge Decker stressed that the Supreme Court:

. . . nowhere specifically states that *Hanover Shoe* had standing because it was in 'privity' with United Shoe or that privity is a requirement of standing in private antitrust cases. In fact, this court has searched in vain for any discussion of the question of standing in the *Hanover Shoe* opinion. If the court there had intended to establish such a rule, it clearly would have said something about the recent and substantial body of authority which had reached a contrary conclusion and permitted suits under § 4 of the Clayton Act by those not in 'privity' with the alleged antitrust violator. See, e. g., . . . Karseal Corp. v. Richfield Oil Corp., 221 F.2d 358 (9th Cir. 1955) . . . State of Washington v. General Electric Co., 246 F.Supp. 960 (W.D.Wash.1965). 59 F.R.D. at p. 595.

Judge Decker therefore concluded that:

"it would be stretching *Hanover Shoe* beyond all recognition to hold that its rejection of the passing-on defense somehow returns § 4 of the Clayton Act to the 'days when "privity" was king' . . ." 59 F.R.D. at p. 596.

Defendants cite a line of cases led by Philadelphia Housing Authority v. American Radiator & Standard Sanitary Corp., 50 F.R.D. 13 (E.D.Pa.1970), Aff'd per curiam sub. nom., and Mangano v. American Radiator & Standard Sanitary Corp., 438 F.2d 1187 (3d Cir. 1971) to support their interpretation of *Hanover.* In *Mangano,* homeowners brought suit alleging that illegal overcharges by manufacturers of plumbing fixtures had increased the cost of their buildings. Plaintiffs contended that the overcharge had been passed-on through wholesalers and building contractors to

them as ultimate purchasers. The Third Circuit held that *Hanover Shoe* barred plaintiffs' claims primarily on two grounds: (1) establishing that illegal overcharges were passed on would involve "insurmountable" problems of proof, and (2) suits by anyone other than the initial purchaser would subject defendants to the risk of multiple liability.

The Ninth Circuit considered these contentions in a later decision, In Re Western Liquid Asphalt Cases, 487 F.2d 191 (1973), finding both questions resolvable without denying standing to non-direct purchasers. This Court agrees with the Ninth Circuit decision.

■■ It is this Court's opinion that the Supreme Court's elaboration on the difficulties of proof encountered as to once-removed purchasers was not intended to foreclose, as a matter of law, the right of once-removed purchasers ever to sue and establish damages. Rather, the Supreme Court held that when the first purchaser sues, he need not establish that damages were not passed on, because of the difficulties of proof associated therewith.

■ The second ground of the Third Circuit's opinion in *Mangano* was that granting standing to other than first-purchasers would subject defendants to the risk of multiple liability. This Court disagrees and notes the following language from In Re Western Liquid Asphalt Cases, *supra*, on page 201:

> Thus, in passing-on cases, the intermediary should recover the amount of the overcharge that was not passed on, if the proof shows that the ultimate consumers did not pay it all, and any lost profits resulting from increased costs. The ultimate purchasers should obtain the remainder of the overcharge, and any other damages proximately caused. Facts rais-

ing reasonable inferences, based upon appropriate market data, should suffice to go to the jury on these questions.

In a case where both the intermediary and the ultimate consumer are not before the court in the same suit, settlement or award in the first suit can be credited against the damages determined in the second suit, if greater, thereby avoiding multiplicity of liability. In this way the antitrust laws would not be frustrated, for example, by prior settlements with initial, and perhaps friendly, purchasers.

This Court does not believe that in *Hanover* the Supreme Court intended to foreclose standing to all plaintiffs not immediate purchasers from alleged antitrust violators.

■ There are several types of consumers that may decide to sue.[3] The first is an *immediate consumer* (direct purchaser) who usually acts as a middleman, reselling either the same goods or a refined product to another consumer. A second is a *final consumer,* who obtains goods from the manufacturer or from a subsequent consumer, but who in either case acquires the goods in the same condition as originally made and sold by the manufacturer. The last type of consumer is an *ultimate consumer* who obtains a finished product from a middleman that has altered or added to the goods received from the manufacturer. There are, then, *two* different types of indirect consumers: the final consumer and the ultimate consumer.

The immediate consumer unquestionably has standing to sue the antitrust violator. Hanover Shoe, Inc. v. United Shoe Machinery Corp., *supra*.

As to the *final* consumer, many recent cases, excluding those that construe *Hanover Shoe* restrictively, grant stand-

---

3. This breakdown is adopted from "Mangano and Ultimate Consumer Standing: The Mis-

use of the Hanover Doctrine," 72 Colum.L. Rev. 395, 396 (1972).

ing to sue the antitrust violator. State of Washington v. General Electric Co., 246 F.Supp. 960 (W.D.Wash.1965); Public Utility District No. 1 of Chelan County Washington v. General Electric Co., 230 F.Supp. 744 (W.D.Wash.1964); Armco Steel Corp. v. North Dakota, 376 F.2d 206 (8th Cir. 1967); Missouri v. Stupp Brothers Bridge & Iron Co., 248 F.Supp. 169 (W.D.Mo.1965); State of Washington v. American Pipe & Construction Co., 274 F.Supp. 961 (W.D. Wash.1967); Boshes v. General Motors Corp., 59 F.R.D. 589 (N.D.Ill.1973); In Re Western Liquid Asphalt Cases, 487 F.2d 191 (9th Cir. 1973).

■■■ Standing to sue for the final consumer turns on whether the court applies the "direct injury test" or the "target area test". The direct injury approach requires plaintiff to suffer the immediate effect of the antitrust activity. This has been interpreted to apply only to the party dealing directly with the antitrust violator—the immediate consumer. All other parties are deemed to be remote and indirect. Loeb v. Eastman Kodak Co., 183 F. 704 (3rd Cir. 1910). The practical effect of this test is to require privity, although the cases rarely address themselves to that concept.

The broader target area test was first espoused in Karseal Corp. v. Richfield Oil Corp., 221 F.2d 358 (9th Cir. 1955). In applying that test to a final consumer plaintiff, the court said he must be "within that area of the economy which is endangered by a breakdown of competitive conditions in a particular industry." *Id.* at 55.

The Ninth Circuit has both expanded and narrowed the *Karseal* test depending upon circumstances of the particular case. In Twentieth Century Fox Film Corp. v. Goldwyn, 328 F.2d 190 (9th Cir. 1964), the court expanded the target area to that "area which it could reasonably be foreseen would be affect-

ed by the [antitrust] conspiracy." Again, the indirect consumer granted standing was a *final* consumer. Yet in the recent case of Hawaii v. Standard Oil Co., 431 F.2d 1282, aff'd 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972), the court refused standing to sue in an action by the state as *parens patriae* on behalf of its citizens suing for alleged injury to the general economy. The court stated that the injury of the citizens was too incidental or remote to create standing to sue.

Acceptance of the *ultimate* consumer as plaintiff in an antitrust action has been less enthusiastic. One of the few cases to grant standing to an *ultimate* consumer is In Re Master Key Antitrust Litigation, 1973 Trade Cas. ¶ 74,680 (D. Conn.1973). This is not to say that the arguments of ultimate consumers are entirely without merit, or that successful arguments made on behalf of other indirect consumers are in no way applicable to ultimate consumers. The Court merely notes that, based upon legal precedent, ultimate consumers have rarely been granted standing to sue as distinguished from other indirect consumers.

The Seventh Circuit stated its position as to ultimate consumers in Commonwealth Edison Co. v. Allis-Chalmers Mfg. Co., 315 F.2d 564 (7th Cir. 1963). This was an antitrust suit brought by a utility against a manufacturer of electrical equipment, charging conspiracy to fix prices. The State of Illinois sought to intervene as plaintiff on behalf of consumers of electrical energy. In denying intervention, the Court said:

Could the State of Illinois bring a direct action against defendants? The answer is "no", because there was no direct proximate impact of the conspiracies on the consumers. The impact on them was remote and took the shape of allegedly higher rates paid for utility services—rates established as legal by the Illinois Commerce Com-

mission. Although these rates may be determined to have been unreasonable because of conspiratorially fixed equipment costs which went into the basic rate structure, that is another issue not cognizable in these antitrust actions, 315 F.2d at 567.

█ The Seventh Circuit's holding that the injury to the consumer was too remote to grant standing to sue is binding upon this Court. This Court therefore holds that, as to *ultimate* consumers, their injuries are too remote and consequential to provide legal standing to sue against the alleged antitrust violator.

Defendants next move for summary judgment against all plaintiffs who have made direct purchases from non-defendants. Defendants argue that plaintiffs have alleged purchases only from defendants, and that non-defendants from whom purchases were made are not alleged to be conspirators.

█ Where a horizontal conspiracy is charged and proven, a defendant is liable for all damages sustained by reason of sale at non-competitive prices by all conspirators, *whether named as defendants or not.* Further, case law supports the proposition that a defendant would be liable for damages suffered as a result of purchases from non-conspirators who nevertheless charged prices identical with or close to those of their conspiring competitors. Wall Products Co. v. National Gypsum Co., 357 F.Supp. 832 (N.D.Cal.1973); State of Washington v. American Pipe & Construction Co., 280 F.Supp. 802 (W.D. Wash.1968).

█ Defendants are granted summary judgment against all non-direct purchasers of concrete block that constitute ultimate consumers as defined in this opinion. Defendants' motion for summary judgment as to direct purchasers from non-defendants is denied.