**BILL MINIELLI CEMENT CONTRACTING, INC., et al., Plaintiffs,**

v.

**RICHTER CONCRETE CORPORATION et al., Defendants.**

**No. 8547.**

United States District Court,
S. D. Ohio, W. D.

June 29, 1973.

Leo J. Breslin, Cincinnati, Ohio, for plaintiffs; Gene I. Mesh, Cincinnati, Ohio, David Berger, P. A., Philadelphia, Pa., of counsel.

Ralph F. Mitchell, Cincinnati, Ohio, Hugh L. Nichols II, Batavia, Ohio, Murray S. Monroe, Samuel M. Allen, Cincinnati, Ohio, for defendants.

## OPINION

PORTER, District Judge:

This is a private antitrust case in which plaintiffs charge defendants conspired to fix prices of ready-mix concrete and also discriminated in such prices. Plaintiffs requested that the case be designated as a class action pursuant to Rule 23 Fed.R.Civ.P.

The defendants strongly oppose this motion. They do so on the ground that there is no proof the class is too numerous to make joinder impracticable, common questions of law and fact do not predominate, and plaintiffs are not suitable representatives of the class anyhow.

The question about predominance of common issues of law and fact which arises because the proposed class would include indirect as well as direct purchasers is one on which there is conflict in the law, and which, as far as we have been able to determine, has not yet been addressed by the Sixth Circuit. Because of that and the importance of the question presented, that particular question merits full discussion and a rather full description of the pleadings and proceedings is in order.

## I.

On August 23, 1972, Bill Minnielli Cement Contracting, Inc., filed a complaint naming Richter Concrete Corporation, Hilltop Concrete Corporation, six cement companies, one John Doe ready-mix concrete company and one John Doe cement company as defendants. The complaint charged these defendants with engaging in a conspiracy to fix prices in violation of § 1 of the Sherman Act, 15 U.S.C. § 1. The conspiracy was alleged to have begun in 1967 and continued to the present. In the complaint Minnielli alleged that it represented a class under Rule 23(a) and (b)(3) Fed.R.Civ.P. consisting of all those entities .and persons situated within the Cincinnati area— Butler, Hamilton, Warren and Clermont Counties—who had purchased ready-mix concrete directly or indirectly from the defendants during the relevant time period. The purchaser category was broken down into the following subclasses:

"(1)(a) All general and paving contractors in the Cincinnati area who have purchased ready-mix concrete . . . during the period in suit, *and have sustained damage* as a result of the combination and conspiracy in violation of the antitrust laws hereinafter alleged.

"(b) All consumers, including builder-owners and/or builder developers and/or operations of industrial, commercial and/or residential construction and all state, county and local governments and political subdivisions in the Cincinnati area, who have purchased, directly or indirectly, ready-mix concrete during the period in suit *and have sustained damages* as a result of the combination and conspiracy in violation of the antitrust laws hereinafter alleged." [Emphasis added.]

Plaintiff went on to allege the requirements provided by Rule 23(a), (b)(3) for maintaining a class action are met. Plaintiff also alleged it had no knowledge of the alleged conspiracy or any facts which might have led to its discovery until November 17, 1970, and claimed that it could not have discovered the conspiracy on any earlier date through the exercise of due diligence because of deceptive practices and techniques of secrecy employed by the defendants and their co-conspirators to avoid detection and to fraudulently conceal the combination and conspiracy.

On September 28, 1972, plaintiff filed an amended complaint adding Debbie, Inc., as a party-plaintiff and adding a claim of price discrimination under the Clayton Act, 15 U.S.C. § 13(a). In the amended complaint there is the same allegation of fraudulent concealment as appeared in the original.

On September 28, 1972, plaintiff also filed a motion (document 20) to have this action certified as a class action and a memorandum in support of that motion. Additionally, on September 28, 1972, a stipulation of dismissal was, at the request of the plaintiff, entered as to four of the cement companies. After the stipulation of dismissal the remaining defendants were Richter Concrete Corporation, Hilltop Concrete Corporation, Michael Concrete Products, Inc., Crew Builders Supply Co., John Doe Ready Mix Concrete Co. and John Doe Cement Co.

On October 26, 1972, the defendants filed a response to plaintiffs' class action motion along with a supporting memorandum, and on November 3, 1972, an evidentiary hearing was held on the

class action question. At this hearing two witnesses gave oral testimony, portions of several depositions were designated, and affidavits were offered and admitted.

On November 15, 1972, the Court received the plaintiffs' reply memo on the class action issue, and on November 30, 1972 the defendants' supplemental memorandum. Thus the class action question stands submitted on the amended complaint, the oral testimony, depositions and affidavits, together with extensive briefs.

## II.

■■ The first issue is whether the class which plaintiffs seek to represent is so numerous as to make joinder of all members impracticable. The burden of showing that the prerequisites of a class action exist under Rule 23(a)—including membership so large, etc.—is on the party who seeks to represent a class. Cash v. Swifton Land Corporation, 434 F.2d 569 (6 Cir., 1970); Demarco v. Edens, 390 F.2d 836 (2 Cir., 1969); Kinzler v. New York Stock Exchange, 53 F.R.D. 75 (S.D.N.Y.1971); City of Philadelphia v. Emhart Corporation, 50 F.R.D. 232 (E.D.Pa., 1970); Philadelphia Electric Co. v. Anaconda American Brass Co., 43 F. R.D. 452 (E.D.Pa., 1968).

To sustain their burden on this issue plaintiffs submitted the affidavit of their counsel in which he stated that through a process of cross-referencing the Directory of the Ohio Contractors Association to the Yellow Pages of the telephone directories of Hamilton, Clermont, Butler and Warren Counties, he found 500 to 600 general contractors and 150 to 200 cement and concrete contractors and paving contractors. Plaintiffs' counsel admitted overlap in the listings of general contractors and concrete and paving contractors. He also admitted that not all entities listed had purchased ready-mix.

In reference to the "consumer" subclass, in his affidavit plaintiffs' counsel stated that in consulting Volume 2 of the 1972 Directory of Ohio Manufacturers, 27th Ed., pp. 879, et seq., he found the four counties involved in the suit and 70 municipalities located within the counties.

William J. Minnielli stated there are four other people in the area whose business is from 80% to 90% concrete paving (Minnielli deposition, p. 63). Obviously, if the class is limited to paving contractors it is not so numerous as to make joinder impracticable and, of course, the defendants urge that the class be limited to paving contractors. In this connection, defendants argue that plaintiffs should be bound by Minnielli's deposition that there are four other companies whose business is 80%–90% paving work.

If it is not so limited and includes all contractors and/or entities, there is no evidence from which the Court can determine exactly how many of such contractors or entities bought ready-mix from the four defendants and how many from other ready-mix companies in the Cincinnati area. There are at least four such companies (Minnielli deposition, p. 79).

The plaintiffs called as witnesses three contractors besides Minnielli—Kremer, Ross and Boettle. Kremer testified he purchased concrete from both Hilltop and Richter during the relevant time period (Kremer deposition, p. 26). Ross said he bought a lot of concrete during the relevant time period from Richter and Hilltop (Ross deposition, p. 26).

Boettle said his company purchased ready-mix, presumably from the defendants on occasion (Boettle deposition, p. 6). Of course, Minielli stated that on behalf of Bill Minnielli Cement Contracting, Inc., and Debbie, Inc., he purchased ready-mix from the defendants and referred to nine entities in the State of Ohio as customers or indirect purchasers.

Of course, if they purchased ready-mix at artificially high prices as a result of a conspiracy by the defendants to fix prices, that would be a *per se* violation of the antitrust laws, and no proof of damages would be necessary. We nevertheless find Kinzler v. New York Stock Exchange, *supra,* a case in which ascertainment of the number in the class of 1500 required a determination of which ones suffered damage—we find it analogous, and, of the cases cited above, the closest to the instant case on the facts.

In *Kinzler* a registered representative employed by the brokerage firm of Goodbody & Co. brought suit on his own behalf and on behalf of a purported class of the 1500 registered representatives employed by Goodbody during the pendency of an alleged freeze by the New York Stock Exchange in the processing of transfer applications by Goodbody's registered representatives to other brokerage firms. Plaintiff's complaint alleged a conspiracy and combination in restraint of trade among the Exchange, Merrill Lynch, Pierce, Fenner & Smith, Inc., and Goodbody in violation of §§ 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2. With reference to the class which plaintiff sought to represent the Court said:

> Plaintiff in his complaint and in his papers in support of this motion defines the class as encompassing "those who applied for transfer in vain and those who knew that they were frozen, did not make the vain request, but nevertheless saw their accounts being transferred to other brokerage houses." (Plaintiff's reply memorandum, p. 5.) A registered representative who was unable to follow his customers out of Goodbody would have been injured because of the alleged freeze whether or not he attempted to transfer to another brokerage firm. On the other hand, it does not follow that a registered representative who made a transfer application would be injured because of the alleged freeze if none of his customers abandoned him. Therefore, the court defines the class as consisting of those Goodbody registered representatives who lost customers to other brokerage firms as a result of Goodbody's precarious financial condition and were unable to follow these customers out of Goodbody because of the alleged freeze.

> While plaintiff appears to be a member of this class, it does not follow that all other Goodbody registered representatives are also members of this class.

> Under Rule 23(a)(1), F.R.Civ.P., the burden is on the plaintiff to make a positive showing "that the members of the alleged class are so numerous as to make it impracticable to bring them all before the court." Demarco v. Edens, 390 F.2d 836, 845 (2d Cir. 1968). As was the situation in *Demarco, supra,* the evidence as to the size of the class and the impracticability of joinder is purely speculative. See also Cannon v. Texas Gulf Sulphur Co., 53 F.R.D. 216 (S.D.N.Y. 1971); William Goldman Theatres, Inc. v. Paramount Film Distributing Corp., 49 F.R.D. 35 (E.D.Pa.1969). *Plaintiff has failed to show how many Goodbody registered representatives lost customers to other brokerage firms during the freeze.* Plaintiff has also failed to show that the Goodbody registered representatives who lost customers are so geographically spread out as to make joinder impracticable or that the damages to each are so small as to make individual prosecutions of their actions impracticable. Therefore, on this record the court cannot find that "the class is so numerous that joinder of all members is impracticable." 53 F.R.D., at 77. [Emphasis added.]

We find the analogy between *Kinzler* and *Minnielli* compelling. In *Minnielli* while plaintiffs' counsel has stated he found 500–600 general contractors and 150–200 concrete and cement contractors

and paving contractors, four counties and seventeen municipalities within the Cincinnati area, there is evidence of direct purchase from defendants by only five and of indirect purchase as to approximately ten of Minnielli, Inc.'s customers. On that state of the record plaintiffs would say in effect it stands to reason a large number of general contractors, cement and paving contractors, counties and municipalities, located in the Cincinnati area, purchased some ready-mix concrete from the defendants, directly or indirectly, during the relevant time period and thereby suffered damages. However, such a conclusion would have to be based on evidence which is at least as speculative as that held insufficient to establish class size in *Kinzler, supra*. Furthermore, as in *Kinzler*, there is no hard evidence as to the size of the claims of the potential class members, though there can be no argument that the potential class members are so geographically widespread as to make joinder impracticable. The Court concludes that plaintiffs have not sustained their burden of showing that the class they seek to represent is too numerous to permit practical joinder and this is sufficient to warrant the Court's denial at this time of the motion to certify this case as a class action.

We pass to a discussion of additional reasons for such denial.

### III.

■ First we note that if Minnielli and Debbie, Inc., prevailed in this action on the issue of a price fixing conspiracy and fixing prices pursuant to the conspiracy, it would seem that even without a class action this would inure to the benefit of other purchasers of ready-mix under the doctrine of collateral estoppel. See Rachal v. Hill, 435 F.2d 59 (5 Cir., 1970); Lynne Carol Fashions, Inc. v. Cranston Print Works Co., 453 F.2d

1177 (3 Cir., 1972); Bernhard v. Bank of America National Trust & Savings Association, 19 Cal.2d 807, 122 P.2d 892 (1942).

We also note that plaintiffs recognize one purpose of a class action in an antitrust suit is to enable small claims plaintiffs to have their day in court. In this connection we question whether general contractors, cement and paving contractors, building developers, State, County and local governments, etc., can be viewed as "small claimants."

Next we turn to a consideration of the *Hanover Shoe* [1] problem which arises from the allegation in the amended complaint that plaintiffs seek to represent "all those entities and persons situated within the Cincinnati area . . . who have purchased ready-mix concrete, *directly or indirectly*, from the defendants during the relevant time period." [Emphasis added.] We conclude that the inclusion of indirect purchasers within the claimed class raises serious questions as to whether common questions of law or fact predominate over questions affecting only individual members.

We begin by noting what the Supreme Court said in limiting the applicability of the "pass-on defense" in antitrust cases:

". . . Even if it could be shown that the buyer raised his price in response to, and in the amount of, the overcharge and that his margin of profit and total sales had not thereafter declined, there would remain the nearly insuperable difficulty of demonstrating that the particular plaintiff could not or would not have raised his prices absent the overcharge or maintained the higher price had the overcharge been discontinued. Since establishing the applicability of the passing-on defense would require a convincing showing of each of these

1. Hanover Shoe, Inc. v. United Shoe Machinery Co., 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231.

virtually unascertainable figures, the task would normally prove insurmountable." Hanover Shoe, Inc. v. United Shoe Machinery Co., 392 U.S. 481, 493, 88 S.Ct. 2224, 2231, 20 L. Ed.2d 1231.

The Court went on to indicate those instances in which it felt the pass-on defense still applicable, stating:

". . . We recognize that there might be situations—for instance, when an overcharged buyer has a preexisting 'cost-plus' contract, thus making it easy to prove that he has not been damaged—where the considerations requiring that the passing-on defense not be permitted in this case would not be present." 392 U.S., at 494, 88 S.Ct. at 2232.

Subsequent cases have interpreted *Hanover Shoe* as precluding recovery for illegally high prices charged unless the purchaser was a direct, in privity, purchaser, who did not resell on a "cost-plus" basis or was an indirect, no privity, purchaser who bought pursuant to a "cost-plus" contract. Philadelphia Housing Authority v. American Radiator & Standard Sanitary Corp., 50 F.R. D. 13 (E.D.Pa., 1970), aff'd 3 Cir., 438 F.2d 1187; City and County of Denver v. American Oil Co., 53 F.R.D. 620 (D. Colo., 1971). For a recent case where the pass-on defense was applied to bar a direct purchaser from recovery where he resold on a "cost-plus" bases, see Obron v. Union Camp Corporation, 477 F.2d 542 (decided April 11, 1973, Court of Appeals for the Sixth Circuit).

It is true that some cases have held that in a price-fixing case the overriding considerations typifying each claim are the need to prove:

1. That there was a conspiracy to fix prices in violation of the antitrust laws;

2. That prices were fixed pursuant thereto; and

3. That plaintiffs purchased products at prices which, as a result of the conspiracy, were higher than they should have been.

State of Iowa v. Union Asphalt and Roadoils, Inc., 281 F.Supp. 391 (S.D. Iowa, 1968); Philadelphia Electric Company v. Anaconda American Brass Co., 43 F.R.D. 452 (E.D.Pa., 1968); Sol S. Turnoff Drug Dist., Inc. v. N. V. Nederlandsche, Etc., 51 F.R.D. 227 (E.D.Pa., 1970). However, both *State of Iowa* and *Philadelphia Electric* were decided prior to *Hanover Shoe* and did not deal with the indirect purchaser "cost-plus" problem. *Turnoff* dealt only obliquely with the issue because there the manufacturer sold directly to both the so-called wholesalers and so-called retailers. It is interesting to note that the Court in *Turnoff* relied in part on State of Minnesota v. United States Steel Corporation, 44 F.R.D. 559, 572 (D.C.Minn., 1968) for the proposition that in the normal antitrust case proof of the conspiracy presents predominate questions of law and fact. Later developments in the *State of Minnesota* case (see State of Minnesota v. United States Steel Corporation, 299 F.Supp. 596 (D.C.Minn., 1969) and State of Minnesota v. United States Steel Corporation, 438 F.2d 1380 (8 Cir., 1971)) proved that the "cost-plus" passing-on defense issues involved cast serious doubts on the predominance of common questions. In commenting on this case, the Court in *City and County of Denver, supra,* said:

"If State of Minnesota v. United States Steel Corp., supra, establishes nothing else, it surely demonstrates the improbability that common questions of law and fact will predominate in a class action such as the one we are today considering. Whether the passing-on rule precludes recovery by a particular plaintiff *is a question of liability to that plaintiff*—not just a question as to the dollar amounts which may be due that plaintiff . . . ." 53 F.R.D., at 635. [Emphasis added.]

The *Denver* court further said, at page 638:

"With equal clarity, many of the entities sought to be included in the class here are not the first persons in the chain of distribution, and *Mangano* [Mangano v. American Radiator & Standard Corp., 438 F.2d 1187 (3 Cir., 1971)] may well prevent recovery on their part. Certainly, with this very real possibility in the offing, it would be foolhardy to make this case into a class action before we find out just how predominate the common issues of fact and law are."

It is indicative that we are in a developing area of law that both sides have supplemented their extensive briefs by letters citing cases reported since the briefs were completed. On behalf of the plaintiffs these cases are Boshes v. General Motors Corp., 59 F.R.D. 589 (D.C. N.D.Ill.,E.D., filed May 3, 1973), and Southern General Builders, Inc. v. Maule Industries, Inc., CCH 1973 Trade Cases, p. 94,152 [¶ 74,484]. On behalf of one defendant we have been cited to Kent Gneiting v. Peter J. Tagares, CCH 1973 Trade Cases 93,976 [7440] (D.C.Idaho). Though the facts are quite different, we feel it also appropriate to take note of the recent decision of the Second Circuit, Eisen v. Carlisle and Jacquelin, summarized in 41 U.S.L.W. 1171 and in greater detail at 479 F.2d 1005.

In that case the Court not only rejected recent procedural innovations regarding "reasonable" notice and preliminary "mini-hearings" on the merits for the purpose of allocating the cost of notice, but rejected "fluid" recoveries as without foundation in Rule 23 and of questionable constitutionality and doubtful morality because of their *"in terrorem"* effects. We take note of this because plaintiffs urge that the Court can figure out later which class members are direct and which are indirect purchasers, or appoint a Master for that purpose. If I understand it correctly, this is either "fluid recovery" also, or analogous thereto.

In Boshes v. General Motors, *supra,* plaintiff sought damages against GM for an alleged conspiracy to monopolize and fix prices on passenger automobiles and a proposed class to consist of all purchasers of GM automobiles from 1965 until certification was rejected on grounds of unmanageability. Nevertheless the Court concluded that the plaintiffs had standing and discussed at great length the *Hanover Shoe* question raised by the contention of plaintiffs that they were damaged because the alleged overcharge was "passed on" to them by GM retail dealers and the contention of GM that any overcharges were not passed on to the consumer (*Id.,* 59 F.R.D. page 592 et seq.) In scholarly and convincing fashion the Court decided that remoteness and not privity is what is to be taken into account in determining standing. It also emphasized that in *Hanover Shoe* Justice White placed strong emphasis on the Court's desire to encourage private treble damage actions. *Id.,* Footnote 11, 59 F.R.D. pp. 597, 598.

In this long footnote there is agreement with the handling of the question by Judge Miles W. Lord in the broad spectrum antibiotics antitrust litigation rejecting the claim by purchasers of finished animal feed products containing the antibiotic drug that they had standing to sue the drug manufacturers—because of remoteness and not lack of privity. There Judge Lord said there were distinctions in the principles laid down in *Hanover Shoe* where the passing-on doctrine was being used as a defense to permit the defendants to escape liability and a case such as the antibiotic case (and this case) where the passing-on doctrine is invoked as part of an attempt to award damages to those who ultimately paid higher prices and avoid giving a windfall gain to those who were not injured. Judge Lord also pointed out that the use of the passing-on doc-

trine to determine standing will not limit or frustrate but will instead encourage treble damage claims.

There are important distinctions between the case before this Court and *Boshes*. For one thing in *Boshes* the statute of limitations had cut off the rights of retail dealers from whom the plaintiffs before the Court purchased their automobiles and there was therefore no possibility of double liability (*id.*, 59 F.R.D. p. 597). As to other potential plaintiffs, the Court said if the statute of limitations did not obviate the possibility of double liability, the doctrine of collateral estoppel probably would (*id.*, 59 F.R.D. p. 597), but most importantly in *Boshes* the plaintiffs were consumers of a product marketed *in the same form* that it was when sold by the alleged antitrust violator, and, for this reason, they were not "too remote" to have standing to sue under § 4 of the Clayton Act (*id.*, 59 F.R.D. p. 597).

In the instant case the indirect purchasers would not be consumers of a product marketed in the same form that it was when sold by the alleged antitrust violators. Thus, a "tracing" problem exists (not present in *Boshes*) to create an "insurmountable task" on proof of damages.

To summarize, in the case before this Court plaintiffs have not shown how many members of the asserted class are indirect purchasers. Neither have plaintiffs shown how many indirect purchasers purchased pursuant to a "cost-plus contract" and how many did not. As in *City and County of Denver, supra,* there is a real possibility that many of the indirect purchasers will be precluded from recovery. We conclude, as the Court did in *City and County of Denver* that it would be foolhardy to make this a class action without knowing just how predominant the common issues of fact and law are. Neither can we conclude on the present state of the record that this should be certified as a class action composed only of direct purchasers, because with indirect purchasers out of the picture it is obviously less likely that there would be so many direct purchasers as to make their joinder impracticable.

### IV

We next consider a different aspect of the motion. It concerns the suitability of the plaintiffs as representatives of any class. Since we are not certifying this as a class action at this time it may be unnecessary to do this. However, we anticipate there may be a request for an interlocutory appeal, because this decision may relate to a controlling question of law to which there is substantial ground for difference of opinion and an immediate appeal may materially advance the ultimate determination of the litigation. Hence, we have decided to include it.

The plaintiffs' suitability as a class representative is drawn into question in three ways. One is the denial by the defendants of plaintiffs' allegation, for statute of limitations purposes, that they had no knowledge of the alleged conspiracy or of any facts which might have led to its discovery until November 17, 1970, and they could not have discovered the conspiracy's existence at an earlier date through the exercise of due diligence because of deceptive practices and techniques of secrecy employed by the co-conspirators to avoid detection and to fraudulently conceal the combination and conspiracy. The second is a claim by the defendants that there were improprieties at the inception of such a nature as to warrant refusal of certification. The third arises from the defendants' contention that plaintiffs are not suitable representatives because they have a conflict of interest.

Taking the statute of limitation question first, we begin by noting the following testimony in the deposition of William Minnielli, owner of both the named plaintiffs.

"Q Let me rephrase the question, Mr. Minnielli. When is the first time you had reason to believe or suspicion that there was some sort of tampering with the price of ready-mix in the Cincinnati Area?

"A Ten years ago. And I think it was stated in the record before. Its been going on in the past since 1965 that I know of.

"Q You had reason to believe that there was price fixing in ready-mix?

"A Yes, sir."

■ This statement may well prevent the establishment of a valid fraudulent concealment claim for the named plaintiffs. Bolam v. Louisville & Nashville Railroad Company, 295 F.2d 809 (6 Cir., 1961).

15 U.S.C. § 15b provides that:

Any action to enforce any cause of action under sections 15 or 15a of this title shall be forever barred unless commenced within four years after the cause of action accrued.

Generally a cause of action accrues and the statute begins to run when a defendant commits an act that injures plaintiff's business. Zenith Radio Corporation v. Hazeltine Research, 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971). Therefore, each time a plaintiff or potential class member bought at prices which, as a result of the alleged conspiracy, were illegally high, a cause of action against defendants would accrue. Also, the four-year statute would begin to run with respect to that purchase. The complaint in this action was filed on August 23, 1972. Absent the claim of fraudulent concealment, no recovery could be had for illegally high prices charged prior to August 23, 1968. The complaint, however, alleges that the price fixing conspiracy began in or about 1967. To avoid the barring of claims for purchases occurring prior to August 23, 1968, plaintiffs allege that defendants fraudulently concealed the conspiracy so that it could not be discovered until November 17, 1970. If this were the true state of affairs the statute of limitations would not begin to run until November 17, 1970, and claims of purchases of ready-mix at the illegally high price prior to August 23, 1968 would not be barred.

■ William Minnielli having admitted that he knew for years of price tampering, equal pricing, and collusion, seems a poor representative for any class member who has a valid fraudulent concealment claim. Additionally, claims of fraudulent concealment involve highly individualized questions of fact. To show application of the doctrine it has been held that a plaintiff must show use of fraudulent means by the defendant to conceal and also that the efforts to conceal were successful. Kansas City, Missouri v. Federal Pacific Electric Co., 310 F.2d 271 (8 Cir., 1962). The person seeking to assert the doctrine must have exercised due diligence to discover the conspiracy. Laundry Equipment Sales Corp. v. Borg Warner Corp., 334 F.2d 788 (7 Cir., 1964). While the question of usage of fraudulent means by defendants to conceal the conspiracy would be common to all members of the class, the questions of exercise of due diligence and success of concealment would have to be answered on an individual basis for each class member.

■ The third question on this aspect of the case (suitability of named plaintiffs as representatives of the class)—as noted above—arises from the contention of the defendants that plaintiffs' counsel engaged in conduct which makes it inappropriate to name plaintiffs as the representative of a class. On this the evidence showed that some time during the month of August, 1972, prior to the filing of this action, plaintiffs' attorney had a conversation with one Joseph Schwarz, president of Universal Home Builders, Inc., and in the presence of Schwarz's attorney asked Schwarz if he wanted to bring any kind of action or participate in any action against Hilltop.

Schwarz replied that he was not interested (tr. 36–37). Also there was testimony at the hearing on the motion to certify to the effect that Minnielli had said that his attorney had sought him out with the idea of bringing this suit (tr. 43). The affidavit of plaintiffs' counsel and that of Mr. Minnielli counter this and compel the finding that it was Minnielli who sought out counsel with a view toward bringing suit. We also find and conclude that counsel's conversation with Mr. Schwarz, which is not denied or controverted, does not, however, amount to a solicitation of the class action, which, in itself would be sufficient to prevent certification of the class. Roger O. Halverson v. Convenient Food Mart, Inc., 458 F.2d 927 (7 Cir., 1972). Cf. Taub v. Glickman, 14 Fed. Rules Ser. 2d 847 (S.D.N.Y., 1970); Korn v. Franchard Corp., 50 F.R.D. 57 (S.D.N.Y., 1970).

Nevertheless we are unable to say that the conversation inclines us toward or is a factor in favor of class certification. Carlisle v. LVT Electrosystems, Inc., 54 F.R.D. 237, 240 (N.D.Tex., 1972); see also, Manual for Complex and Multidistrict Litigation (rev'd May 18, 1970) at 1.61.

■ Next, on this aspect of the case is the question which arises from defendants' contention that plaintiffs are not suitable because they have a conflict of interest. In their amended complaint plaintiffs make the allegation that:

". . . defendants engaged in price discrimination in that defendants would from time to time quote lower prices to certain purchasers who would not quote the same prices to plaintiffs, and said price discrimination is in violation of Section 2A of the Clayton Act, as amended by the Robinson-Patman Act."

That statute [15 U.S.C. § 13(a)] makes it unlawful—

". . . either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them. . . . ."

In essence, plaintiffs allege that defendants discriminated in price between different direct and indirect purchasers of ready-mixed concrete in the Cincinnati area. We think this situation presents irreconcilable conflicts among the potential class members. Since plaintiffs seek to represent "all those entities and persons situated within the Cincinnati area . . . who have purchased, directly or indirectly from the defendants . . .," they would be in the position of representing both those discriminated against and those in whose favor discrimination occurred. It is obvious that in order to prove a cause of action against defendants plaintiffs would have to establish that some class members received favorable treatment and thus have no cause of action. Furthermore, if the favored members of plaintiffs' claimed class knowingly induced or received a discrimination in price which discrimination was prohibited by the Clayton Act, the unfavored members might have a cause of action against them. 15 U.S.C. § 13(f). Thus, in proving the price discrimination claim, the unfavored members might prove liability to them on the part of the favored members.

■ Plaintiffs state that the Court should sever the Sherman Act cause of action from the Robinson-Patman Act violation, proceed with the Sherman Act cause, and then, at a later date, proceed with the Robinson-Patman Act claim. There is authority for such a procedure where appropriate. Rule 23(c)(4) provides:

"When appropriate (A) an action may be brought or maintained as a class

action with respect to particular issues, . . . ."

However, this case does not strike me as appropriate for severance at this juncture. We have already determined that the Sherman Act claim is not appropriate as a class action. Nothing would be gained by our delaying decision with respect to whether or not the Robinson-Patman Act claim should proceed as a class action. We think it should not. Not only do the earlier-mentioned conflicts exist, but also there is no reason to believe that if the favored parties are removed the remaining members would be so numerous as to make joinder impracticable. William Goldman Theatres, Inc. v. Paramount Film Dist. Corp., 49 F.R.D. 35, 39 (1969).

That completes the discussion of why the Court concludes that the motion to certify this cause as a class action should be denied. An order to that effect will be filed simultaneously with this opinion.

