## Pennsylvania Dental Association v. Medical Service Association

*Jeffrey W. Davis, Thomas A. Beckley,* for plaintiffs.
*William H. Wood,* for defendants.

SHEELY, *J.,* October 12, 1982—On January 18, 1977, the above named plaintiffs filed a complaint in equity against the above named defendant.[1] The complaint broadly attacked the operation of defendant's insurance plan. The essential allegations are paraphrased as follows:

---

1. This complaint was filed pursuant to Pa.R.C.P. 2230. This type of action is now controlled, however, by Pa.R.C.P. 1701 et seq.

382

(1) Pennsylvania Blue Shield [hereinafter PBS], in violation of the Act of November 15, 1972, P.L. 1063, as amended, 40 Pa.C.S. §6324(b), imposes illegal restrictions on health service doctors as to their methods of diagnosis and treatment. Defendant conducts a dental review program in which it investigates health care diagnosis and that treatment proposed by the doctor as well as that treatment actually given. Before defendant will pay for dental services, it requires the doctor to submit a statement of the services he intends to render and the cost thereof. Defendant also requires that pre-treatment and post-treatment radiographs (x-ray pictures) be submitted before payment is made. The taking of pre-and post-treatment radiographs results in unnecessary radiation exposure to defendant's subscribers. In some instances, for example, those involving only teeth with gingival ("gum") problems, this requirement leads to radiation exposure which is wholly unnecessary in the first instance. In some instances defendant refused to pay for the proposed treatment. In so doing, it substitutes its judgment for that of the doctor and thus imposes illegal restrictions on the doctor's methods of diagnosis and treatment.

(2) Defendant, by conducting its dental review program in the above-stated manner, constantly violates §6324(b) by interfering in the type of services to be rendered and the method of rendering them. This results in a doctor-patient relationship which is not "identical with the relation that ordinarily exists in the community between a health service doctor and his patient "as is provided for in 40 Pa.C.S. §6324(b).

(3) Defendant, by changing the plan for dental treatment agreed to by a dentist and patient, creates in the patient's mind a doubt as to both the compe-

tency and honesty of the dentist and causes the patient to "change" dentists, thus interfering with "the choice or selection by a patient of his 'dentist' after that choice has been made by an adult of sound mind."

(4) Defendant violates the provisions of its "participating agreement" with health service doctors who provide diagnosis and treatment to defendant's subscribers in that the "participating agreement" provides that "preauthorization" for a procedure is limited to a determination of the eligibility of its subscriber, the coverage for services proposed, and defendant's allowance for such services. (See "Participating Doctor's agreement with PBS," attached to original complaint of January 18, 1977 as Exhibit A). *In practice,* defendant is affecting diagnosis and treatment methods by its use of the "preauthorization" procedure.

(5) The Act of November 15, 1972, P.L. 1063, as amended, 40 Pa.C.S. §6303, establishes categories of low-income and over-income persons. Guidelines for specifically differentiating the services to which low-income persons are entitled from those to which persons of over-income are entitled are provided in the Act of November 15, 1972, P.L. 1063, as amended, 40 Pa.C.S. §6325(c). Defendant violates these guidelines in its "Prevailing Fee Program"[2] which makes no distinction between low-income and over-income subscribers. In order for doctors to become "participating doctors" with PBS,

2. PBS operates the prevailing fee program on a "UCR" or usual, customary, and reasonable fee system which involves mathematical calculations. The operation of the program and its methodology are explained in the March 8 and 9, 1982 Deposition of Donald S. Mayes, D.D.S., pages 132-171, and in the testimony of Carol L. Kennedy at the April 29 1982 hearing, pages 183-248.

(a status which permits the doctors to receive payment directly from PBS rather than having the payment sent to the individual subscriber) they must agree to be bound by the "Prevailing Fee Program" which denies plaintiffs' permission to charge over-income persons for that portion of plaintiffs' fees which are not paid by defendants. This results in losses of income to plaintiffs.

On February 8, 1977, PBS filed preliminary objections to the complaint and a date was set for argument. It was soon thereafter brought to the attention of the court that there was then pending before the Pennsylvania Insurance Department a proceeding concerning a number of amendments to the PBS dental service agreement, wherein the Pennsylvania Dental Association [hereinafter PDA] and certain individual dentists, including all of plaintiffs in this case, had intervened. They there raised a number of the same objections to the operation of the PBS dental program as were raised in their complaint. Accordingly, the court stayed proceedings in this action pending a determination of the similar issues then before the Pennsylvania Insurance Department.

PBS's amended rules for its dental service agreement, filed under No. 5-H-1970, were approved by the Insurance Commissioner in an adjudication issued on July 19, 1977. In that adjudication, the issues raised by plaintiffs in their complaint were disposed of. On August 8, 1977, plaintiffs filed an appeal from the adjudication of the Insurance Commissioner. In view of these pending proceedings in the Commonwealth Court dealing with issues raised in the instant case, the court, in an order of August 16, 1977, again stayed the proceedings in this case pending a decision by the Commonwealth

Court. Plaintiffs, on September 15, 1977, filed an application for extraordinary relief in the Supreme Court of Pennsylvania, seeking to compel this court to proceed in this action. The application was denied by the Supreme Court by order dated October 12, 1977.

On March 5, 1979, the Commonwealth Court, in a unanimous decision, affirmed the Insurance Commissioner's approval of the amendments to the PBS dental plan. Pennsylvania Dental Association, et al. v. Commonwealth of Pennsylvania, Insurance Department, 41 Pa. Commw. 47, 398 A.2d 729 (1979). (Plaintiffs' petition for allowance of appeal was denied by the Pennsylvania Supreme Court on June 4, 1979 (No. 437 Allocatur Docket)). This court then heard arguments upon defendant's preliminary objections to the complaint, which had been stayed since June of 1977. In an opinion and order issued on May 9, 1980, this court sustained defendant's preliminary objections to the original complaint, and granted plaintiffs leave to file an amended complaint. Pennsylvania Dental Association v. Medical Service Association of Pennsylvania, 30 Cumb. L.J. 147 (1980).

Plaintiffs filed their amended complaint on May 29, 1980. Their amended complaint retained substantial portions of their original complaint and added a number of paragraphs pertaining to plaintiffs' ability to represent the interests of an entire class. Plaintiffs also added serveral paragraphs alleging that PBS's use of "profiles" (mathematically calculated scales), to determine the fee PBS will pay to dentists for services violates the above-mentioned sections of the Regulatory Act of November 15, 1972, 40 Pa.C.S. §6301 et seq.

PBS filed preliminary objections to the amended complaint. On January 5, 1981, this court denied

PBS's preliminary objections to the amended complaint, holding that plaintiffs had pled sufficient questions of fact to defeat a demurrer. This court, at pages 2 and 3 of its January 5, 1981 opinion, specifically noted that plaintiffs, after the decisions of the Insurance Commissioner and the Commonwealth Court, were no longer averring that the written policies of PBS's dental program were illegal. Now, instead, plaintiff avers that the manner in which PBS conducts its dental program "violates §6324(b) of the Regulatory Act."

Plaintiffs moved for class certification pursuant to Pa.R.C.P. 1707(a). A hearing was held before this court on April 29 and 30, 1982, to determine whether plaintiffs satisfied the requirements of Pa.R.C.P. 1702, 1708 and 1709 so as to permit them to continue this suit as a class action. From the testimony we make the following:

## FINDINGS OF FACT

1. Plaintiff Pennsylvania Dental Association, is a non-profit corporation, organized and existing under the laws of the Commonwealth of Pennsylvania, with offices situate at 3501 North Front Street, Harrisburg, Pa., and has as members approximately 6,300 dentists (doctors of dental surgery, D.D.S. and doctors of dental medicine, D.M.D.) who are licensed to practice as dentists in the Commonwealth of Pennsylvania and who are affected by the activities of defendant. (Amended complaint [hereinafter Amd C.] ¶1; N.T. 170).[3]

2. Plaintiff John L. Bomba, D.D.S., an individual, is a doctor of dental surgery, who has been licensed

_____

3. All notes to testimony, unless otherwise stated, are from the transcript of the proceedings of April 29 and 30, 1982.

to practice in the Commonwealth of Pennsylvania since 1946. He is currently, and has been since 1975, an administrator at Temple University School of Dentistry. (Amd. C. ¶2; N.T. 10, 11).

3. Plaintiff John L. Bomba, D.D.S., has been a member of the PDA since 1946 and has held the following offices therein: President Elect; President Immediate; Past President; Member of Board of Trustees in those above-mentioned capacities; and Member of Board of Trustees by virtue of his office with the American Dental Association [hereinafter ADA], which was that of Trustee from the Third District to the ADA.

4. Plaintiff Alex J. McKechnie, D.D.S., an individual, is a doctor of dental surgery, licensed to practice in the Commonwealth of Pennsylvania since 1950. He had been engaged in the private practice of dentistry, until 1979, with his then most recent offices situate at 19 North 24th Street, Camp Hill, Pa. In 1979, he sold his practice and since then has been engaged in volunteer work for the aging and indigent, in nursing homes and other places where they may need his services.

5. Plaintiff Alex J. McKechnie, D.D.S., has been a member of the PDA since 1950. He has held the following offices therein: Secretary; President; and Member of the Board of Trustees.

6. Plaintiff George M. Shopp, D.D.S., an individual, is a doctor of dental surgery, licensed to practice in the Commonwealth of Pennsylvania since 1951. He is currently engaged in the private practice of dentistry with offices situate at 3032 Cumberland Boulevard, Camp Hill, Pa. He has been a member of the PDA since 1951.

7. Plaintiff David S. Wagner, D.D.S., an individual, is a doctor of dental surgery, licensed to practice in the Commonwealth of Pennsylvania since

1948. He is currently engaged in the private practice of dentistry with offices situate at 14 West Aspen Street, Hazelton, Pa.

8. Plaintiff David S. Wagner, D.D.S., has been a member of the PDA since 1948. He has held the following offices therein: Secretary; President Elect; President; and Immediate Past President.

9. Plaintiff Hollis W. Zwicker, D.D.S., an individual, is a doctor of dental surgery, licensed to practice in the Commonwealth of Pennsylvania since 1945. He is currently engaged in the private practice of dentistry with offices situate at 547 North Avenue, Millvale, Pittsburgh, Pa. He has been a member of the PDA since he began practice in 1948 after a three year tour of duty in the United States Navy.

10. Defendant Medical Service Association of Pennsylvania, t/d/b/a Pennsylvania Blue Shield (a ficticious name registered with the Commonwealth of Pennsylvania on February 5, 1965, and in the office of the Prothonotary of Cumberland County, Pennsylvania, on February 6, 1965), is a professional health service corporation existing pursuant to the provisions of the Act of November 15, 1972, P.L. 1063, as amended, 40 Pa.C.S. §§6101-6701, with offices situate at Taylor Bridge By-Pass, East Pennsboro Township, Cumberland County, Pa.

11. Plaintiff PDA is governed by a Board of Trustees elected from ten geographical districts within Pennsylvania and by a House of Delegates whose approximately 130 members are elected proportionally from among the PDA membership in those ten geographical districts.

12. The Executive Committe of PDA's Board of Trustees authorized the institution of litigation on PDA's behalf against PBS on November 14, 1975.

13. PDA's Board of Trustees authorized PDA to participate in the instant action in January of 1977.

14. Since 1975, PDA's House of Delegates has continually approved the association's annual budget, which includes a non-specific allocation for legal expenses. Thus, in essence, continuing to authorize PDA participation in this suit.

15. PDA's participation in the instant action was precipitated by a number of complaints received from members about certain activities of PBS.

16. PBS offers health care "insurance" or "prepaid" health care plans to individuals and groups in Pennsylvania, including the prepaid dental programs that are the subject of this litigation. These plans provide for, inter alia, payment by PBS for dental diagnosis and treatment given to "subscribers" or persons "covered" by a plan issued by PBS.

17. There are currently enrolled in PBS dental programs approximately 1,360,000 subscribers, on whose behalf approximately 1,800,000 claims are submitted annually for services rendered.

18. More than 85 percent of those approximately 1,360,000 subscribers have what PBS refers to as "UCR" coverage.

19. All payments made by PBS for dental services performed for subscribers having "UCR" coverage are calculated according to the "UCR" payment mechanism.

20. PDA objects to the use of the "UCR"[4] ("usual, customary, and reasonable") mechanism for determining payments. Group dental contracts employing the "UCR" mechanism pay dentists for services rendered to PBS subscribers on the basis of a complex mathematical formula based upon the dentist's

---

4. See footnote 2, supra, for details of where an extensive explanation of the mathematical calculations used in the "UCR" program may be found. Here we will only provide a capsule explanation of the most important parts of its calculations as they pertain to the issues currently before the court.

"usual" charge to be paid to an individual dentist for a given procedure on the basis of the data actually reported by that dentist to PBS.

21. A dentist will receive his "usual" charge for each service performed for a PBS subscriber, unless his "usual" charge exceeds the "customary" charge for the service in question. The "customary" charge is defined as the ninetieth percentile of all charges reported for that particular service by all dentists of the same specialty in Pennsylvania. The "customary" charge is the highest charge PBS will pay for any particular service, except in unusual circumstances not relevant to this discussion. In such circumstances, PBS pays a "reasonable" fee appropriate to the difficulty of the services rendered, and the time and professional skill involved.

22. PBS establishes new "usual" charge "profiles" for all dentists providing services to its subscribers annually on July 1, based upon charge data submitted by each dentist during the first three months of that year. Thus, when a dentist increases his fee for a particular service, the "usual" fee paid to him by PBS when he renders that service to a PBS subscriber will not increase immediately. The higher fee level, however, would normally be reflected in the next annual update of the doctor's usual fee profile.

23. As part of its administration of its dental program, PBS offers to dentists the right to become "participating doctors." A "participating doctor" signs an agreement whereby he agrees to abide by PBS's "Regulations for Participating Doctors." Each dentist who becomes a "participating doctor" enters into the same standard agreement with PBS, and the terms of the agreement are applied in the same manner to all dentists who become "participating doctors."

24. One of the primary obligations imposed upon participating doctors is an undertaking to accept the "UCR" allowance determined by PBS as payment in full for covered services rendered to PBS subscribers.

25. When a PBS subscriber receives covered services from a participating dentist, the dentist reports the services to PBS on the prescribed "Dental Service Report" and receives payment directly from PBS.

26. It is entirely optional with a dentist whether to be a "participating dentist" under the PBS program, and it is entirely optional with the PBS subcriber whether to utilize the services of a "participating dentist."

27. When a PBS subscriber utilizes the services of a "non-participating dentist," payment is made directly to the subscriber rather than to the dentist. The amount to be paid for the service in question is calculated on the basis of the "UCR" formula in the same manner as is done in the case of a "participating dentist." However, the "non-participating dentist," having no contractual agreement to do so with PBS, is not bound to accept the "UCR" allownace as his fee, and may bill and often does bill the subscriber whatever fee he desires for the services in question.

28. With respect to its "participating doctors" and its "UCR" coverage, PBS makes no distinction between "low-income" and "over-income" subscribers.

29. All PBS "UCR" dental subscribers are covered under a "prototype contract," referred to by PBS as "Penndental I." Coverage of subscribers for certain benefits under "UCR" contracts may vary from group to group, but the basic provisions of the con-

tract are the same for all groups having "UCR" coverage.

30. The standard PBS Dental Service Agreement excludes from coverage certain types of dental services and supplies. Among these are services or supplies that are not necessary according to accepted standards of dental practice, services that are cosmetic in nature, and services that do not meet accepted standards of dental practice. The contract also contains a provision that provides where there are two or more acceptable methods of treatment that will adequately treat a particular dental condition, PBS's liability is limited to the least expensive of those satisfactory options.

31. PBS's Dental Service Agreement provides that certain treatment plans be submitted to PBS for "predetermination." "Predetermination" is defined as the pretreatment review of proposed services to determine whether the subscriber is eligible, to what extent the proposed services are covered, and how much PBS will pay for those services.

32. The "predetermination" process begins with the dentist submitting a form to PBS, accompanied by appropriate diagnostic aids such as x-rays, and a list itemizing the procedures proposed to be performed and the dentists' charges for those procedures. PBS, assisted by a licensed dentist acting as a "dental advisor" in cases involving professional judgment, reviews the proposed treatment plan to determine whether the subscriber has coverage for the services in question, whether any of the services proposed are excluded under the terms of the contract, and whether there is a satisfactory but less expensive alternative to any of the proposed treatments. After this review, PBS returns the form to the dentist indicating what services are covered and

the extent of PBS's financial liability for any covered services.

33. If a dentist disagrees with any "predetermination" decision, such as a finding that a particular service is unnecessary or that PBS's financial liability will be limited to the cost of a less expensive alternative treatment, he may seek review of that determination by a second dental advisor. If the second dental advisor agrees with the initial determination, the dentist is free to seek further review of the dispute from the Peer Review Committee of the PDA. In some instances a further review may be had from the dental review committee of PBS.

34. "Predetermination" only constitutes approximately 8.7 percent of the claim volume. Many services do not require "predetermination."

35. In the administration of its dental program, PBS generally requests the submission of pre-treatment x-rays in cases where the cost of the proposed treatment is expected to exceed $150, involves oral surgical procedure, or involves the extraction of six or more teeth. Additionally, PBS also generally requests post-treatment x-rays for root canal therapy. These practices are applied identically by PBS to all dental claims it receives.

36. Plaintiffs present as a factual contention that PBS's application of its policy regarding the submission of x-rays by dentists results in unnecessary exposure of its subscribers to radiation.

37. When, under one of the General Exclusions and Limitations as above quoted in finding of fact 28, PBS denies "UCR" coverage for a service proposed or performed by a dentist for one of its subscribers, it follows the same practice in all cases with respect to informing the relevant dentist and subscriber of its judgment that the proposed or performed services are "not necessary," or "a more ex-

pensive course of treatment than is customarily provided by the dental profession . . . for the dental condition concerned."

38. Plaintiffs present as a factual contention that PBS attempts to impose its judgment as to what is appropriate treatment upon dentists treating its subscribers by suggesting alternative forms of treatment or commenting on whether or not treatment is necessary.

39. Plaintiffs allege that, in the administration of the various contract provisions already referred to, PBS exceeds its authority under its contract and under the Regulatory Act and improperly interferes with the dentist-patient relationship.

40. Plaintiffs present as a factual contention that PBS does not divide its "UCR" subscribers into "low-income" and "over-income" categories, and requires all dentists who want to "participate" under the "UCR" program to accept its payments as payment-in-full for all services performed for subscribers under that program.

41. Plaintiffs further contend that PBS should be required to establish a category of "over income" patients and permit participating dentists who provide care for such patients to receive the "UCR" allowance for that treatment directly from PBS and bill the patient for any difference between the "UCR" allowance and the dentists' normal fee for that service.

42. Plaintiffs Bomba and McKechnie do not actively practice dentistry, treat no PBS patients and submit no claims to PBS although plaintiff McKechnie had regularly treated patients with PBS coverage until 1979.

43. Plaintiffs Wagner, Shopp, and Zwicker are not "participating dentists" with PBS but they treat

PBS patients as "non-participating dentists" on a regular basis.

44. Plaintiffs Wagner and Shopp contend that PBS's application of its uniform policies regarding submission of x-rays has, in their individual practices, resulted in unnecessary radiographs being taken.

45. Plaintiffs Zwicker, who has had x-rays requested of him by PBS, and Shopp, both also acknowledge that some of the x-rays that had been requested by PBS were x-rays that had already been made by them in the course of diagnosis and treatment.

46. Plaintiffs Wagner and Shopp contend that PBS has interfered with their relationships with their patients having PBS coverage by suggesting alternative forms of treatment as "less expensive but adequate;" by suggesting that the "prognosis was not favorable" for certain treatment; and by "claiming" that treatment was "unnecessary."

47. Plaintiffs Wagner, Shopp and Zwicker each testified to one or more experiences in which PBS has declined to pay for treatments recommended by them in a treatment plan.

48. Plaintiff Wagner acknowledged that each such determination involved a unique individual.

49. Plaintiffs Wagner, Shopp and Zwicker were all aware that further review of PBS's decisions with respect to a dentist's submission of x-rays and alternative methods of treatment could be had by way of review and by a second dental advisor and/or submission to peer review committee of the PDA.

50. Plaintiffs McKechnie and Zwicker were both formerly parties to "participating doctor's" agreements with PBS.

51. Plaintiffs McKechnie and Zwicker contend that, as "participating doctors" they were required

to accept PBS's payments as payment-in-full for all services performed for PBS "UCR" subscribers, regardless of whether the payments equalled their fees for the services, and regardless of whether the subscribers for whom the services were performed would properly be characterized as "low-income" or "over-income."

52. Plaintiffs Bomba, McKechnie, Wagner and Zwicker have all requested the right to "participate" with PBS under terms which would require them to accept PBS payments which were less than their regular fees for services rendered to PBS subscribers only in the case of "low-income" PBS subscribers.

53. PBS, as of 1981, lists over 4,000 Pennsylvania dentists as "participating doctors."

54. Plaintiff Shopp acknowledged that his interests, as a "non-participating doctor," may differ from those of a "participating doctor" with regard to the charging of over and under-income patients.

55. Three dentists, William J. Rumberger, D.D.S. of Sunbury, Pa., Clayton O. Pesillo, D.M.D. of Mifflinburg, Pa. and Leon M. Penzur, D.D.S., of Philadelphia, Pa., all of whom are members of PDA and are "participating dentists," testified that, in their opinions, their interests, as "participating dentists," would be adversely affected if plaintiffs in this action were to obtain the relief sought.

56. Witnesses Pesillo and Penzur acknowledge that it does not appear that the relief requested by plaintiffs would force them to charge their patients more than the PBS allowance.

57. It has been acknowledged that dentists are in competition with each other and that this competition consists largely of attempting to attract and maintain patients. A number of witnesses believed that they had had patients leave them because they

were "non-participating doctors," the patients then going to "participating doctors." It has been opined on the basis of personal experience that "participating" status helps a dentist increase the size of his practice.

58. Plaintiff McKechnie's losses would amount to several hundred dollars of lost income per year from approximately 1972 or 1973.

59. Plaintiffs Wagner, Shopp and Zwicker are making no claims for damages.

60. The attorneys for plaintiffs satisfy the requirements of Pa.R.C.P. 1709(1) regarding adequate representation of the interests of the class.

61. Plaintiffs satisfy the requirements of Pa.R.C.P. 1709(3) regarding adequate financial resources to assure that the interests of the class will not be harmed.

62. The Pennsylvania Department of Health actively regulates the relationship between PBS and health doctors by receiving and approving the regulations for "participating doctors." Further, health service doctors and others aggrieved by policies or practices of PBS can submit their disputes to the department for resolution.

63. PDA and various of its members have litigated and are currently litigating other actions in the courts of the Commonwealth of Pennsylvania involving some of the same factual issues that have been raised in this case.

## DISCUSSION

Plaintiffs seek to represent the class of all dentists licensed to practice in Pennsylvania. Plaintiffs' motion for class certification is before this court pursuant to Pa.R.C.P. 1707.

3 Standard Penna. Practice 2d §14:65 (1981) some general rules derived from Pa.R.C.P. 1707 for determining class action certification are provided:

"The hearing for certification is limited to the Class Action Allegations, and, in determining whether to certify the action as a class action, the court must consider all relevant testimony, depositions, admissions, and other evidence. The hearing is not concerned with the merits of the controversy or with attacks on the other averments of the complaint. Its only purpose is to decide whether the action will continue as a class action or as an action with individual parties only. In a sense, it is designed to decide who will be the parties to the action and nothing more.

Pa.R.C.P. 1702 provides more specific criterion to be used in making this assessment. This rule provides:

"One or more members of a class may sue or be sued as representative parties on behalf of all members in a class action only if

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class;

(4) the representative parties will fairly and adequately assert and protect the interests of the class under the criteria set forth in Rule 1709; and

(5) a class action provides a fair and efficient method for adjudication of the controversy under the criteria set forth in Rule 1708.

A number of important points should be kept in mind in making this assessment. For instance:

"Since the class action is an important social de-

vice that makes possible the effective assertion of many claims that otherwise might not be litigated, decisions in favor of maintaining a class action should be liberally made. Broad discretion is vested in the trial court to determine "definition of the class as based on commonality of issues and the propriety of maintaining the action on behalf of the class." Klemow v. Time, Inc., 466 Pa. 189, 197, 352 A.2d 12, 16 cert. denied, 429 U.S. 828 (1976). Nevertheless, the minimum requirements of Pa.R.C.P. 2230[5] and of Klemow[6] must be met. Bell v. Beneficial Consumer Discount Company, 241 Pa. Super. 192, 205, 360 A.2d 681, 688 (1976).

Pa.R.C.P. 1702(1) requires that the class be so numerous that joinder of all members would be impracticable. The evidence shows that there are over 6,300 Pennsylvania dentists who are PDA members and over 4,000 of such dentists are PBS "participating doctors." It is apparent from a reading of the text and the cases cited in 4 Anderson's Penna. Civil Practice §2230.8 (1962 & Supp. 1982) [hereinafter Anderson] and 5 Goodrich-Amram 2d §1702:2 (Supp. 1982) [hereinafter Goodrich-Amram] that plaintiffs fulfill the requirements of Pa.R.C.P. 1702(1).

---

5. Pa.R.C.P. 2230 dealt with the requirements for maintaining a class action which are now covered by Pa.R.C.P. 1701 et seq. Although Klemow and Bell were decided under old Pa.R.C.P. 2230, there is nothing in the new rules to suggest any modification of that discretion. "In fact Rules 1708 and 1709 plainly imply a continuation of substantial discretion by stating certain criteria to be considered but without stating the weight to be accorded each criterion or rendering the criteria exclusive." ABC Sewer Cleaning Company v. Bell of Pennsylvania, 293 Pa. Super. 219, at n.4, 438 A.2d 616, 619 at n.4 (1981).

6. The requirements of Klemow were set forth at 241 Pa. Super. at 198-199, and at 360 A.2d at 684. Those requirements are also now covered in Pa.R.C.P. 1701 et seq.

Pa.R.C.P. 1702(2), a verbatim copy of Federal Rules of Civil Procedure 23(a) (2), requires that there be questions of law or fact common to the class. It is readily apparent that there are some common questions of fact that apply to all members of the class that plaintiffs purport to represent. PBS applies a number of the practices at issue here in the same manner to all dentists in the Commonwealth. It is not necessary at this stage of the analysis to show that such common questions predominate over questions affecting only individual class members. For explanations of the analysis required at this stage, see Hedges Enterprises, Inc. v. Continental Group, Inc., 81 F.R.D. 461, 465 (E.D. Pa., 1979); 3B Moore's Federal Practice ¶23.06-1 (1982) [hereinafter Moore]; 7 C. Wright & A. Miller, Federal Practice and Procedure: Civil §1763 (1972 & Supp. 1981) [hereinafter Wright & Miller]; 5 Goodrich-Amram 2d §1702:3.

Pa.R.C.P. 1702(3), a verbatim copy of F.R.C.P. 23 (a) (3), requires that the claims of the representives be "typical" of the claims of the class. Courts have expressed "some doubt as to the precise meaning" of this clause. Minnesota v. United States Steel Corporation 44 F.R.D. 559, 566 (D. Minn. 1968). 2 Webster's New Twentieth Century Dictionary Unabridged 1979 (2d ed. 1964) defines "typical" as " . . . 2. having or showing the characteristics, qualities, etc. of a kind, class, or group as fully as to be a representative example." This requirement of showing "typicality" has been equated with F.R.C.P. 23(a) (2)'s [Pa.R.C.P. 1702 (2)] common questions requirement or with F.R.C.P. 23(a) (4)'s [Pa.R.C.P. 1702 (4)] adequate representation requirement. Indeed, at first glance, it might appear that the "typicality" requirements are included in and met in the above cited provisions but such is not necessar-

ily the case. 3B Moore ¶ 23.06-2; 7 Wright & Miller §1764; 5 Goodrich-Amram 2d §1702:4.

The federal district court, in Hedges, supra, at 465-466 outlines a number of the required points of analysis:

"As with the requirement of Rule 23(a) (2), [1702 (2)] the representative plaintiff's *claims* must be *similar enough* to permit the Court to conclude that the representative party will adequately represent the interests of the class and that there are *no antagonistic or adverse interests between the representative plaintiff and the proposed class* [citations omitted] . . . While it is generally recognized that the typicality requirement of Rule 23 (a) (3) [1703 (3)] and the adequacy requirement of Rule 23 (a) (4) [1702 (4)] "represent a two-pronged approach intended to insure that the claims of the class members are fully presented and vigorously prosecuted" and that "the typicality requirement functions as a safeguard against inter-class conflicts and an assurance that the plaintiff's interests are more or less co-extensive with those of the class" [citations omitted], it is also generally recognized that "the mere fact that a representative plaintiff stands in a different factual posture is not sufficient to refuse certification . . . *[t]he atypicality* or conflict *must be clear* and be such that the interests of the class are placed in significant jeopardy." [Citations omitted] (Emphasis added.)

Plaintiffs have pointed out in their brief that even if factual differences exist between the claims of the representative parties and the claims of the class, or if differences exist among class members as to the amount of damages to which they might be entitled, these alone will not act to destroy typicality. ABC Sewer Cleaning Company v. Bell of Pennsylvania, 293 Pa. Super. 219, 438 A.2d 616, 620 (1981);

Ablin, Inc. v. Bell Telephone Company of Pennsylvania, 291 Pa. Super. 40, 50, 435 A.2d 208, 213 (1981); Adamson v. Commonwealth of Pennsylvania, L.C.B., 49 Pa. Commw. 54, 410 A.2d 392 (1980). We would point out, however, that F.R.C.P. 23 (a) (3) [1702 (3)] has been addressed by a number of judges and commentators, often from somewhat differing perspectives, with varying results. 3B Moore ¶ 23.06-2 at 23-191 and 23-192 gives a detailed example of one possible approach to these problems of procedural overlap and factual variety. This court has also read the pertinent sections from all of the treatises previously cited in this opinion and a number of the leading cases, as well as Note, Procedure-Federal Rule of Procedure 23 (a) — Typicality Requirement for Class Actions Reviewed Taylor v. Safeway Stores, Inc., 524 F.2d 263 (10th Cir. 1975), 80 Dick. L. Rev. 835 (1976).

The record contains no indication that PDA renders any dental care services to PBS subscribers, nor is there any indication in the record that PDA has suffered any damages from the acts outlined in the complaint. PDA cannot assert that its claims are similar enough to justify any conclusion on our part that PDA would adequately represent the proposed class's claims. In fact, PDA has no claims of its own in these circumstances. Applying these factors, we interpert the above stated rules and interpretations to mean that PDA does not fulfill the requirements of Pa.R.C.P. 1702 (3).

Plaintiff Bomba no longer actively practices dentistry, nor does he treat any PBS subscribers or submit any claims for payment to PBS. Plaintiff McKechnie is retired and no longer actively practices dentistry and has no legal relationship with PBS.

Again, when applying the proper analysis to this situation, this court fails to discover any claims on behalf of plaintiffs Bomba or McKechnie that would be typical of those this class would assert against PBS. Therefore plaintiffs PDA, Bomba, and McKechnie have failed to meet the requirements of Pa.R.C.P. 1702(3). The remaining plaintiffs might, however.

The record shows that plaintiffs Shopp, Wagner and Zwicker are currently engaged in the practice of dentistry and treat PBS subscribers. These plaintiffs have a legal relationship with PBS, and have actually participated with PBS in some or all of the activities referred to in the amended complaint. It is obvious that these plaintiffs have a claim with sufficient typicality to meet the requirements of Pa.R.C.P. 1702 (3).

Rule 1702 (4), a verbatim copy of F.R.C.P. 23(a) (4), provides that for one or more members of a class to sue on behalf of all members in a class it must be shown that "the representative parties will fairly and adequately assert and protect the interests of the class under the criteria set forth in Rule 1709," which provides:

"Criteria for Certification - Determination of Fair and Adequate Representation.

In determining whether the representative parties will fairly and adequately assert and protect the interests of the class, the court shall consider among other matters

(1) whether the attorney for the representative parties will adequately represent the interests of the class,

(2) whether the representative parties have a conflict of interest in the maintenance of the class action, and

(3) whether the representative parties have or can acquire adequate financial resources to assure that the interests of the class will not be harmed."

The requirements of Pa.R.C.P. 1709(1) and (3) have been stipulated to by PBS and need not be addressed here. The remaining question is whether plaintiffs, as representative parties, have a "conflict of interest in the maintenance of the class action."

In determining this question, a number of principles should be kept in mind. Plaintiffs have the burden of showing that they represent the interests of the purported class. Pennsylvania Company for Insurance On Lives and Granting Annuities v. Deckert, 123 F.2d 979, 984 (3d Cir. 1941); Klemow v. Time, Inc., 466 Pa. 189, 196, 352 A.2d 12, 15-16, cert. denied, 429 U.S. 828 (1976). Persons bringing a class action on behalf of a class must not have interests adverse to the interests of that class. Klemow, supra; 5 Goodrich-Amram 2d §1702:5; Id., §1709:3; 3B Moore ¶23.07[1]. Plaintiffs have cited Haft v. United States Steel Corporation, 129 P.L.J. 1, 19-20 (Allegheny 1980) and its list of potential conflicts of interest which might work to cause a denial of class certification. We would point out, however, that the list is far from exhaustive. There are other conflicts such as those following, which must be kept in mind.

"In order for a party adequately to represent a class . . . his interests must be wholly compatible with and not antagonistic to those whom he would represent." 3B Moore ¶ 23.07[3] at 23-232-233 and cases cited in footnote 1. See also Samuels v. Smock, 54 Pa. Commw. 599, 422 A.2d 902 (1980). This requirement should be stringently applied because members of the class are bound unless they affirmatively exercise their option to be excluded even though they may not be actually aware of

the proceedings. Albertson's, Inc. v. Amalgamated Sugar Company, 503 F.2d 459, 463-464 (10th Cir. 1974). The more rigid requirements of representation should be imposed when the purported class is made up of members who are likely to be in active competition with each other in matters closely related to the subject matter of the litigation. Philadelphia Electric Company v. Anaconda American Brass Company, 43 F.R.D. 452, 463 (E.D., Pa. 1968); 7 Wright & Miller §1768.

Plaintiffs, in their August 29, 1982, memorandum, with recommended findings of fact, conclusions of law and order, for support of motion for class certification in their recommended order, at p. 20, state that they wish to present, inter alia, the following issue:

"¶ 3(c) Whether Blue Shield's practices of requiring all dentists who wish to become "participating doctors" to accept its payments as full payment for services performed for subscribers having "UCR coverage," and of not dividing said subscribers into "low income" and "over income" categories contravene" 40 Pa.C.S. §6325?

It should be kept in mind that "participating dentists" agree to accept PBS "UCR" allowances as payments in full for services rendered to PBS subscribers. Some dentists, by agreeing to accept the benefits offered by PBS as payments in full, attract as patients a number of PBS subscribers who have ceased being patients of "non-participating dentists." Dentists in Pennsylvania are in competition with each other and a good part of that competition involves seeking to attract and maintain patients. It is apparent that some dentists believe that there is a competitive advantage to be gained by deciding to "participate." If the relief plaintiffs seek were to be granted, those who are now "participating" would

lose a competitive advantage because those who would decide to charge more than the payment rendered by PBS would also be permitted to hold themselves out as "participating dentists." We believe this shows that plaintiffs' action is far from wholly compatible with the interests of "participating dentists." There are obviously ongoing competition and conflicts of interest involved here. We would also point out that none of the plaintiffs are currently "participating doctors." Under these circumstances, we cannot find that plaintiffs fulfill the requirements of Pa.R.C.P. 1709(2).

Pa.R.C.P. 1702(5) states that plaintiffs "may sue . . . as representative parties on behalf of all members in a class action only if a class action provides a fair and efficient method for adjudication of the controversy under the criteria set forth in Rule 1708." Rule 1703 provides:

"Criteria for Certification Determination of Class Action as Fair and Efficient Method of Adjudication.

In determining whether a class action is a fair and efficient method of adjudicating the controversy, the court shall consider among other matters the criteria set forth in subdivisions (a), (b) and (c).

(a) Where monetary recovery alone is sought, court shall consider

(1) whether common questions of law or fact predominate over any question affecting only individual members;

(2) the size of the class and the difficulties likely to be encountered in the management of the action as a class action;

(3) whether the prosecution of separate actions by or against individual members of the class would create a risk of

(i) inconsistent or varying adjudications with respect to individual members of the class which would confront the party opposing the class with incompatble standards of conduct;

(ii) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests;

(4) the extent and nature of any litigation already commenced by or against members of the class involving any of the same issues;

(5) whether the particular forum is appropriate for the litigation of the claims of the entire class;

(6) whether in view of the complexities of the issues or the expenses of litigation the separate claims of individual class members are insufficient in amount to support separate actions;

(7) whether it is likely that the amount which may be recovered by individual class members will be so small in relation to the expense and effort of administering the action as not to justify a class action.

(b) Where equitable or declaratory relief alone is sought, the court shall consider

(1) the criteria set forth in subsections (1) through (5) of subdivision (a), and

(2) whether the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making final equitable or declaratory relief appropriate with respect to the class.

(c) Where both monetary and other relief is sought, the court shall consider all the criteria in both subdivisions (a) and (b).

Plaintiffs, in their August 29, 1982, memorandum at pages 19 and 20 state that they wish to present, inter alia, the following issues:

¶ 3(a) Whether Blue Shield's practice regarding the submission of x-rays results in dentists taking unnecessary x-rays, in contravention of 40 Pa.C.S. §6324(b)?

(b) Whether Blue Shield's practice of expressing determinations as to the "necessity" of treatment, its conformity with "accepted standards of dental practice," and the existence of less expensive alternative treatments interferes with the relationship between the members of the class and their patients, in contravention of 40 Pa.C.S. §6324(b)?"

Pa.R.C.P. 1708(a)(1), as quoted above, states that "common questions of law or fact [must] *predominate* over any question affecting only individual members." (Emphasis added). Thus merely meeting the commonality requirements of Pa.R.C.P. 1702(2) is not enough. We have already held, in Pennsylvania Dental Association v. Medical Service Association of Pennsylvania, 30 Cumb. L.J. 147 (1980), that PBS has the authority to issue determinations declining to pay for treatments that it judges to not be dentally necessary. The policy is no longer at issue, rather plaintiffs must prove that some factual pattern occurs in PBS's mode of operation and implementation under the policy that would violate 40 Pa.C.S. §6324(b). In order to prove these factual aspects under a class action suit, it would be necessary that such factual contentions could be possibly established by the same or substantially the same testimony, witnesses, documents, etc. Haft, et al. v. United States Steel Corporation, 129 P.L.J. 1, 23 (1981). The testimony that could here be presented by a limited number of plaintiffs would not make the appropriate showing

as each incident involves different factual circumstances. In a large number of incidents PBS approves the requested treatment. In some instances, treatment is later approved if the individual pursues the matter through PBS's review procedures. Although PBS often sends out one of a variety of standardized form letters to notify the individuals involved, each decision is based upon a unique set of factual circumstances which would require separate testimony and analysis to adjudicate. (F.F. 28-37). We have reviewed a number of cases that deal with similar situations which have also decided that a class action could not be maintained. Metropolitan Hospital, et al. v. Commonwealth of Pennsylvania, Department of Public Welfare, 21 Pa. Commw. 116, 343 A.2d 695 (1975); Tyrone v. O'Neill, 11 D.&C.3d 107 (1979); Klauder v. Philadelphia Newspapers, Inc., 66 D.&C.2d 271 (1974); 3 Standard Pennsylvania Practice 2d §§14:72-74; 5 Goodrich-Amram §1708(a):2. The same situation pertains as to potential testimony and findings regarding the submission of x-rays. Such a class action would soon degenerate into a huge series of disputes based on particular facts and circumstances. Accordingly, we hold that plaintiffs do not meet the requirements of Pa.R.C.P. 1708(a)(1).

Pa.R.C.P. 1708 (a)(2) provides that the court shall consider "the size of the class and the difficulties likely to be encountered in the management of the aciton as a class action." Pa.R.C.P. 1708(a)(2), although derived from F.R.C.P. 23(b)(3)(d), does not include a classification for "superiority." Therefore, the federal authorities cannot be applied indiscriminately, although on the whole, when the facts and circumstances are similar, they can be followed. It should also be kept in mind that the manageability requirement is not de-

signed to serve as an escape hatch to enable courts to avoid the burdens of handling class actions. Mere size does not mean unmanageability. Each case should be judged on its own merits. The court must have sound reasons if it chooses to reject a class action on manageability grounds. 5 Goodrich-Amram 2d §1708(aa):3; 3B Moore ¶23.45 (4.-4).

Plaintiffs' amended complaint, paragraph 36, states:

"Defendant's refusal to permit "participating dentists" to charge ordinary and customary fees to over-income patients but, instead limiting the charges of "participating dentists" to fees established by defendant are causing a large and serious loss of income to plaintiffs and the class they represent."

Plaintiffs' prayer of relief, paragraph six prays that the court "issue an order instructing defendant to pay to plaintiffs, in compensation for their losses suffered as a result of defendant's unlawful policy, damages in the amount of one million dollars ($1,000,000)." Thus it is clear that plaintiffs want to certify the class for damages as well as injunctive relief.

In this instance it would not be difficult to identify PDA members. However, identifiability is only one portion of the considerations to be addressed. Additionally, there are considerations as to whether questions of damages will require a separate hearing for each member of the class. Haft, et al. v. United States Steel Corporation, 129 P.L.J. 1, 24 (1981). We believe in this instance a virtually case by case decision would have to be made as to damages awardable. Just a few of the questions that would arise include: how many billings were sent in over this period and what was the difference in price granted and can the dentist easily verify his own usual charge at the time? What about when pa-

tients opt for a lesser expensive treatment because of findings made by PBS? What are the damages and do they belong to the dentist or the patient?

We have carefully considered a number of Pennsylvania and federal cases dealing with similar facts and circumstances. It is apparent that problems such as those presented here lead to a finding of unmanageability. In Re Hotel Charges, 500 F.2d 86 (9th Cir. 1974); Ralson v. Volkswagenwerk, A.G., 61 F.R.D. 427 (W.D., Mo. 1973); Boshes v. General Motors Corporation, 59 F.R.D. 589 (N.D. Ill. 1973) (Mem.); Lieberman v. Howard Johnson's, Inc., (No. 3) 68 D.&C.2d 192 (1972).

Pa.R.C.P. 1708(a)(3) provides that the court shall consider:

"Whether the prosecution of separate actions by or against individual members of the class would create a risk of

(i) inconsistent or varying adjudications with respect to individual members of the class which would confront the party opposing the class with incompatible standards of conduct;

(ii) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

These factors of the criteria are questions of law for the court to be determined from the nature of the substantive claim, the nature of the evidence, gained from the pleadings and the hearing on certification in support thereof, and the issues raised thereby. Haft, et al. v. United States Steel Corporation, 129 P.L.J. 1, 25 (1981). The basic philosophy behind this part of Pa.R.C.P. 1708, which is substantially derived from F.R.C.P. 23(b)(1) is outlined and explained in 5 Goodrich-Amram 2d §1708(a):4

and 3B Moore ¶23.35(1), (2). The rules are largely self-explanatory. (i) covers the obvious need to protect defendants against a series of individual lawsuits on the same issue where inconsistent adjudications might be reached. But not only must these potential individual adjudications be inconsistent, they must also result in incompatible standards of conduct. We do not believe that danger is here present because each situation must be judged on its own facts and circumstances as to what practice actually took place. For much the same reason, (ii) would not be applicable because each cause of action would be separately based on the peculiar facts of their relationship and situation.

Pa.R.C.P. 1708(a)(4) provides that the court should consider "the extent and nature of any litigation already commenced by or against members of the class involving any of the same issues." There are already a number of suits filed in the Commonwealth of Pennsylvania touching on some of the same issues present here. (F.F. 61). A discussion as to the application of this rule can be found in Haft, et al. v. United States Steel Corporation, 1 P.L.J. 1, 25-26 (1981); 5 Goodrich-Amram 2d §1708(a):5; 3B Moore ¶23.45 (4.-2). There have been suits filed by members of the same ostensible class which, we believe, necessarily reflect significant variations in facts and circumstances. This militates a strong bias in favor of individual control of such actions. Accordingly, Pa.R.C.P. 1708(a)(4) stands against certification of plaintiffs' class action.

Pa.R.C.P. 1703(a)(5) provides that the court should consider "whether the particular forum is appropriate for the litigation of the claims of the entire class." It is not necessary that the class action be a superior forum. Samuels v. Smock, 54 Pa.

Commw. 597, 422 A.2d 902 (1980). Although it has been stated that the factors to be considered are largely those pertaining to the doctrine of forum non conveniens, Haft, et al. v. United States Steel Corporation, supra; 5 Goodrich-Amram 2d §1708(a):6, it has also been pointed out that the considerations may be much broader in scope. Berley v. Dreyfus and Company, 43 F.R.D. 397 (S.D. N.Y. 1967); 7A Wright & Miller §§1777, 1780. This broader scope of consideration includes, inter alia, whether there are other suits based on similar issues in progress and whether there are other better suited methods for handling the issues in controversy. The Pennsylvania Department of Health regulates PBS and settles disputes. The here currently involved disputes can be largely resolved either by submission to a dental advisor or Peer Review Committee. They can also be resolved through complaint and hearing with the Department of Health, a department staffed with knowledgeable officials, or through individual suits based on varying factual circumstances as explained above. For all of these reasons, we do not believe this is the appropriate forum for the resolution of these problems.

Additionally, the court should consider Pa.R.C.P. 1708(a)(6) and (7). The principles to be considered here are outlined in Haft, et al. v. United States Steel Corporation, 129 P.L.J. 1, 26-27 (1981); 5 Goodrich-Amram 2d §§1708(a):7, 1708(a):8. After due consideration of those principles, the underlying policy considerations, and the case law therein cited, we determine that it is not necessary or productive to certify this as a class action.

Pa.R.C.P. 1708(b)(2) provides that where equitable relief is sought, the court should consider "whether the party opposing the class has acted or

refused to act on grounds generally applicable to the class, thereby making final equitable or declaratory relief appropriate with respect to the class." This aspect was already discussed in connection with Pa.R.C.P. 1702(3)'s requirement of "typicality."

## CONCLUSIONS OF LAW

1. Plaintiffs fulfill the requirements of Pa.R.C.P. 1702(1).

2. Plaintiffs fulfill the requirements of Pa.R.C.P. 1702(2).

3. Plaintiff PDA does not fulfill the requirements of Pa.R.C.P. 1702(3).

4. Plaintiffs Bomba and McKechnie do not fulfill the requirements of Pa.R.C.P. 1702(3).

5. Plaintiffs Shopp, Wagner, and Zwicker fulfill the requirements of Pa.R.C.P. 1702(3).

6. Plaintiffs fulfill the requirements of Pa.R.C.P. 1702(4), 1709(1) and 1709(3) through stipulation.

7. Plaintiffs do not fulfill the requirements of Pa.R.C.P. 1702(4) and 1709(2).

8. Plaintiffs do not fulfill the requirements of Pa.R.C.P. 1702(5), 1708(a)(1), 1708(a)(2), 1708-(a)(3)(i)(ii), 1708(a)(4), 1708(a)(5), 1708(a)(6), or 1708(a)(7).

9. Plaintiffs do not fulfill the requirements of 1708(b)(2).

10. Plaintiffs do not meet the necessary criteria for certification as a class action.

## DECREE NISI

And now, this October 12, 1982, we enter the following decree

Class action certification is denied.

## IN RE: MOTION FOR CLASS ACTION CERTIFICATION
### AMENDED DECREE

And now, November 8, 1982, the decree nisi entered by this court on October 12, 1982, is amended so that it should be considered a final decree. See Ablin, Inc. v. Bell Tel. Co. of Pennsylvania, 291 Pa. Super. 40, 435 A.2d 208, 209 (1981); Bell v. Beneficial Consumer Discount Company, 465 Pa. 225, 229, 348 A.2d 734, 736 (1975).